ORIGINAL

FILED IN CHAMBERS
U.S.D.C. - Atlanta

SEP - 9 2020

James N. Hatten, Clerk
By: _____
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

RYAN FELTON

Criminal Indictment

No. **1 : 2 0 · C R 3 4 7**

THE GRAND JURY CHARGES THAT:

**Counts One through Twelve**
18 U.S.C. § 1343
(Wire Fraud Relating to FLiK)

1.  Beginning on a date unknown to the Grand Jury, but from at least in or about August 2017, and continuing through at least in or about August 2018, in the Northern District of Georgia and elsewhere, the defendant, RYAN FELTON, aided and abetted by others known and unknown to the Grand Jury, did knowingly devise and intend to devise a scheme and artifice to defraud others, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, as well as by omission of material facts.

**Background**

2.  At all times relevant herein, FELTON was a resident of Atlanta, Georgia.

3.  FELTON was a television and film director and producer.

4.  Cryptocurrencies are digital assets designed to work as a medium of exchange that uses strong cryptography to secure financial transactions, control the creation of additional units, and verify the transfer of assets.

Cryptocurrencies are circulated over the internet as a form of value.
Cryptocurrencies use encryption to verify the transfer of funds and operate
independently of a central bank.  Cryptocurrencies are similar to paper currency
in that the exchange of cryptocurrencies between individuals is not recorded by
financial institutions.  Cryptocurrencies are not issued by any government, bank,
or company, but rather are generated and controlled through computer software
operating via a decentralized, peer-to-peer network.  Bitcoin (abbreviated as
BTC) and Ether (abbreviated as ETH) are just two of many varieties of
cryptocurrencies.

   5.   Cryptocurrencies are sent to and received from "addresses." An address is
somewhat analogous to a bank account number and is represented as a 26-to-35-
character-long case-sensitive string of letters and numbers. Each address is
controlled through the use of a unique corresponding private key, a
cryptographic equivalent of a password or PIN needed to access the address.
Only the holder of an address's private key can authorize any transfers of
cryptocurrencies from that address to other addresses. Ethereum is an open
source cryptocurrency platform that facilitates transactions of Ether and other
cryptocurrencies.

   6.   Cryptocurrency exchanges are businesses that allow customers to
trade cryptocurrencies for other assets, such as conventional fiat money or other
digital currencies.

   7.   Gemini Trust Company LLC ("Gemini") is a cryptocurrency exchange and
custodian that allows customers to buy, sell, and store digital assets. Gemini is

a New York trust company that is regulated by the New York State Department of Financial Services.

8.  CoinExchange.io ("CoinExchange") was a centralized cryptocurrency exchange based in Australia.

9.  EtherDelta was a decentralized cryptocurrency exchange based in the United States and founded in Chicago, Illinois.

10. Initial coin offerings ("ICOs") are fundraising events during which the issuers of a unique "token" or "coin" set an amount they want to raise, offer it to the public in a crowdsale, and receive cryptocurrency from investors in exchange.

11. ICOs are typically announced and promoted through the internet and e-mail.  Issuers usually release a "whitepaper" that describes the project and the terms of the ICO. After investors transfer funds to the issuer's cryptocurrency address or other account, the issuer will distribute its unique token or coin to the investors' addresses.

### The FLiK Scheme to Defraud

12. Beginning on a date unknown to the Grand Jury, but at least by in or about August 2017, and continuing through at least in or about August 2018, FELTON made false statements to investors and prospective investors about a unique cryptocurrency token he created called "FLiK," including, but not limited to, false statements concerning how proceeds of their investment would be used, the amount of funds needed, and the large amount of other supposed private investments.  FELTON made these false statements to induce individuals to

3

purchase FLiK tokens in order to increase, or pump, the price of the FLiK tokens so that FELTON could sell, or dump, on cryptocurrency exchanges all of the FLiK tokens that he secretly held at an inflated price.

13. On or about August 1, 2017, FELTON promoted the creation of an entity named FLiK. The purported purpose of FLiK was to fund television and film projects and to develop a streaming platform, similar to Netflix or YouTube, for the distribution of such projects to the public.

14. From on or about August 20, 2017, through on or about September 20, 2017, FELTON promoted the sale of "FLiK tokens" in an ICO to the public to raise funds for the development of FLiK.

15. Prior to the start of the ICO, FELTON used the internet, through social media platforms, like Twitter, Facebook and Telegram, and FLiK's own website that FELTON created and controlled at the web address, www.theflik.io, to solicit investors for the FLiK ICO.

16. FELTON also recruited and attempted to recruit celebrities to promote FLiK, including a prominent Atlanta-based rapper and actor ("Individual #1").

17. FELTON published written materials on the internet, and posted information on various internet public forums, purporting to explain the investment. Generally, these materials told investors that their investment would be used to develop and support the FLiK platform.

18. The written materials also stated that after investors transferred funds to FLiK, FLiK would distribute a specific amount of unique "FLiK tokens" to the investors that would be transferrable for streamed content on the FLiK platform.

19. Following the ICO, FELTON continued to post messages promoting the FLIK platform.

20. The vast majority of the representations made by FELTON in the written materials and on the internet before, during, and after the FLiK ICO were false. As alleged more fully below, investor proceeds in the FLiK ICO did not go toward the support or development of the launch of the FLiK platform. Moreover, FELTON posted some of the false and misleading statements promoting the FLiK platform while he secretly sold FLiK tokens to investors on CoinExchange and EtherDelta.

21. FELTON secretly diverted the investor funds raised in the FLiK ICO and sold on cryptocurrency exchanges for his own personal use, including to purchase a million-dollar residence and luxury goods, like jewelry, a black 2017 Chevrolet Tahoe, and a red 2007 Ferrari 599 GTB Fioran Coupe.

22. FELTON gained approximately $2.4 million as a result of this fraudulent scheme.

*False Representations and Omissions in the FLiK ICO Whitepaper*

23. In or about August and September 2017, FELTON drafted and distributed a document entitled "White Paper-FLiK" on the FLiK website at www.theflik.io/white-paper.html, advertising an ICO to raise funds for the development of the FLiK streaming platform.

24. The FLiK whitepaper contained numerous materially false and misleading representations. For example, the whitepaper stated that the funds raised by the ICO would be used solely for the business purposes listed below:

- 50% would be used for licensing content from major studios.
- 25% would be used to fund unique and creative film projects.
- 15% would be used for marketing and promotion of the FLiK platform.
- 10% would be used for implementation with additional viewing platforms.

25. The whitepaper further represented that "[a] total of 50,000,000 tokens are available for purchase during our sale; 500,000,000 are available for distribution . . . . FLiK tokens are ERC2—compliant tokens. **All unsold tokens will be burned.**" (emphasis in original).

26. The burning of unsold tokens after an ICO is important to investors because it means less supply of the tokens is available, which thereby drives up the price of the available tokens.

27. The whitepaper further falsely represented that the FLiK "team" consisted of FELTON, the Founder and Co-Owner of FLiK; Individual #1 as a Co-Owner of FLiK; and a highly regarded cryptocurrency entrepreneur as a member of the FLiK Advisory Board.

28. The representations made to investors in the whitepaper concerning the use of proceeds raised from the FLiK ICO were false. As FELTON then well knew, the proceeds would not be used exclusively for business purposes as represented to investors. Instead, FELTON intended to use, and did use, the proceeds of the FLiK ICO for personal expenses, including to purchase a $1.5 million home, luxury jewelry, and a 2007 Ferrari 599 GTB Fioran Coupe.

29. The representations made to investors that unsold FLiK tokens would be burned also were false. As FELTON then well knew, he would not burn all FLiK tokens that remained unsold after the ICO. Instead, FELTON attempted to drive up the price of the FLiK tokens and intended to, and did, take advantage of the inflated price of FLiK tokens to sell the remaining unsold FLiK tokens on the secondary cryptocurrency markets CoinExchange and EtherDelta.

30. The whitepaper also omitted various material facts, without which the whitepaper was misleading. For example, the whitepaper did not include the fact that FLiK would retain 20 million FLiK tokens or that FELTON intended to keep ten percent (10%) of the FLiK tokens as "compensation" that he intended to "hold on to . . . and exchange for ethereum as the value increases," as he admitted to W.S., who is an employee of Individual #1, days before the ICO launched.

*Pumping of FLiK Tokens after the ICO Begins*

31. On or about August 20, 2017, FELTON initiated the FLiK ICO. FLiK's website provided instructions for investors seeking to purchase FLiK tokens in the ICO. Based on the website, investors could purchase FLiK tokens by transferring Ether to a cryptocurrency address beginning 0x17fD.

32. FELTON solely controlled the cryptocurrency address beginning 0x17fD.

33. Based on the exchange rate of approximately $300 per 1 Ether as of August 20, 2017, and the announced initial FLiK token price of .002 Ether per token, initial investors could purchase one FLiK token for the equivalent of approximately $0.60.

34. Investors purchased thousands of FLiK tokens on the first day of the ICO, and purchases of FLiK tokens continued over the next several weeks.

35. During the ICO, FELTON made numerous materially false and misleading representations meant to convey the popularity and desirability of FLiK.

36. Six days after the ICO began, on or about August 26, 2017, FELTON represented to investors and prospective investors on Telegram, a cloud-based mobile and computer messaging system: "We have a big buyer making a move into FLiK this week.  It looks like he's buying $500,000 worth of tokens."  A week later, on or about September 3, 2017, FELTON stated on Telegram that this buyer instead "took a small equity position and will profit from a significant connection he has at a large movie studio."

37. On or about September 3, 2017, FELTON added to the FLiK whitepaper on the FLiK website, and posted on FLiK's Facebook page, information about a supposed new private investor: "FLiK is excited to announce that the company has secured a significant investment through a private placement offering in accordance with Securities & Exchange Commission (SEC) Rule 501 of Regulation D.  FLiK's founder, Ryan Felton, says, 'We're pleased that our investors have seen the outstanding potential of FLiK.  This investment allows us to complete the buildout and deployment of our streaming platform. Additionally, we have lowered the amount of capital we aim to raise via our ICO . . . .  As a result, our token buyers are able to acquire a substantial amount of FLIK [sic] tokens at significantly reduced pricing.'"

38. On or about September 19, 2017, FELTON represented to investors and prospective investors on Telegram: "Private equity investors wired funds and we reserved coins for them.  They didn't have the ability to purchase them otherwise, but they wanted to be involved with FLiK because they know we can upset Netflix."

39. The representations made on FLiK's website, in the FLiK whitepaper, and on FLiK's various social media sites were false and meant to deceive investors and prospective investors.  As FELTON then well knew, there was not a buyer who invested $500,000 into the FLiK ICO, nor did any investor take any equity position in FLiK.  There also was not a private equity investor who wired funds for the FLiK ICO.  Thus, as FELTON then well knew, there was no additional private investment that allowed FLiK to lower the amount of capital it needed to raise.

*Celebrity Endorsements to Pump the FLiK Tokens*

40. In a further effort to promote the FLiK ICO, FELTON recruited and attempted to recruit celebrities to endorse the ICO.

41. On or about August 15, 2017, FELTON emailed W.S., who is an employee of Individual #1, to suggest that Individual #1 promote FLiK on social media by including in posts the hashtags "#ICO #tokensale #crowdsale #blockchain #ethereum #cryptocurrency," noting, "All of those hashtags are specific to the bitcoin/ethereum world and will BLOW up after he posts/tweets about it."

42. Five days later, on or about August 20, 2017, a post on Individual #1's Facebook page stated: "FLiK #ICO is now open!!! #crowdsale #tokensale

#blockchain #bitcoin #ethereum #BTC #ETH #cryptocurrency #filmmaking #herewego."

43. On or about August 29, 2017, a post on Individual #1's Twitter account stated: "Check out my new #ICO @TheFlikIO it's about to change #Hollywood!!! #Crowdsale #Blockchain."

*The Failure of FLiK to Launch*

44. The FLiK ICO ended on September 20, 2017.

45. By 2018, the FLiK platform still had not launched and the price of FLiK tokens had fallen drastically. For example, by February 15, 2018, the tokens' value had dropped to about $0.18 per token.

46. On or about April 3, 2018, FELTON posted to the FLiK website the following: "We owe you an apology. We're late. We set a goal of launching our service during the first quarter of Q1 in 2018, and we have missed our deadline. For that, we sincerely apologize. The delayed launch can be attributed to one primary factor: licensed content. Without licensed content, we can not go live. The OTT (over-the-top) video streaming platform FLiK is deploying is ready to go, and has been tested and proven in real-world production environments. This means that once we have finalized and secured content licensing agreements, the content can be loaded onto the OTT platform and distributed in short order."

47. Approximately one week later, FELTON dumped thousands of FLiK tokens on the cryptocurrency trading platform CoinExchange.

48. The representations that the FLiK platform was "ready to go" and "proven" were false. As FELTON then well knew, the FLiK platform was not

10

close to deployment and had not been "tested and proven" in a real-world production environment. In fact, the FLiK platform never launched.

49. Based in whole or in part on material misrepresentations and omissions made by FELTON, numerous investors purchased FLiK tokens in the ICO and on secondary cryptocurrency markets.

### Execution of the Scheme

50. On or about each date listed below, in the Northern District of Georgia and elsewhere, for the purpose of executing and attempting to execute the aforesaid scheme and artifice to defraud, and to obtain money and property as set out in Paragraphs 1 through 49 above, the defendant, RYAN FELTON, did, with intent to defraud, knowingly cause to be transmitted in interstate and foreign commerce, by means of wire communication, certain writings, signs, signals, and sounds, that is, wire transfers of cryptocurrency from the investors listed below to purchase FLiK tokens, as follows:

| Count | Date (On or about) | Initials of Investor | Transaction |
|---|---|---|---|
| 1 | 8/20/2017 | K.F. | Purchase of 3,100 FLiK Tokens for 6.2 ether wired from Ethereum wallet beginning 0xEc8d to FLiK Token address beginning 0x17fD |
| 2 | 8/20/2017 | K.F. | Purchase of 500 FLiK Tokens for 1 ether wired from Ethereum wallet beginning 0xEc8d to FLiK Token address beginning 0x17fD |
| 3 | 8/20/2017 | K.F. | Purchase of 1,450 FLiK Tokens for 2.9 ether wired from Ethereum wallet beginning |

| Count | Date (On or about) | Initials of Investor | Transaction |
|---|---|---|---|
| | | | 0xEc8d to FLiK Token address beginning 0x17fD |
| 4 | 10/7/2017 | D.B. | Purchase of approximately 4,116 FLiK Tokens for approximately 0.045 bitcoin through CoinExchange |
| 5 | 10/7/2017 | D.B. | Purchase of approximately 28,318 FLiK Tokens for approximately 0.32 bitcoin through CoinExchange |
| 6 | 10/10/2017 | C.M. | Purchase of approximately 10,670 FLiK Tokens for approximately 4.8 ether through EtherDelta |
| 7 | 10/19/2017 | N.H. | Purchase of approximately 6,734 FLiK Tokens for approximately 0.194 bitcoin through CoinExchange |
| 8 | 11/7/2017 | C.M. | Purchase of approximately 5,055 FLiK Tokens for approximately 0.043 bitcoin through CoinExchange |
| 9 | 11/7/2017 | C.M. | Purchase of approximately 6,573 FLiK Tokens for approximately 0.057 bitcoin through CoinExchange |
| 10 | 4/3/2018 | N.H. | Purchase of approximately 13,860 FLiK Tokens for approximately 0.074 bitcoin through CoinExchange |
| 11 | 5/8/2018 | N.H. | Purchase of approximately 137,750 FLiK Tokens for approximately 0.324 bitcoin through CoinExchange |
| 12 | 5/12/2018 | D.B. | Purchase of approximately 56,742 FLiK Tokens for approximately 0.134 bitcoin through CoinExchange |

All in violation of Title 18, United States Code, Section 1343 and Section 2.

**Counts Thirteen through Twenty**
18 U.S.C. § 1957
(Money Laundering Relating to FLiK)

51. The Grand Jury re-alleges and incorporates by reference Paragraphs 2 through 49 of this Indictment as if fully set forth herein.

52. On or about each date listed below, in the Northern District of Georgia and elsewhere, the defendant, RYAN FELTON, aided and abetted by others known and unknown to the Grand Jury, did knowingly engage and attempt to engage in the following monetary transactions by, through, and to a financial institution, affecting interstate and foreign commerce, each such transaction knowingly involving criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is, wire fraud based on the aforementioned sale of FLiK tokens, in violation of Title 18, United States Code, Section 1343:

| Count | Date (On or about) | Monetary Transaction |
|---|---|---|
| 13 | 10/20/2017 | Wire transfer in the amount of approximately $2.2 million from Gemini account controlled by RYAN FELTON to Wells Fargo account ending 3037, held in the name of RYAN FELTON |
| 14 | 10/24/2017 | Wire transfer in the amount of approximately $500,000 from Wells Fargo account ending 3037, held in the name of RYAN FELTON, to Fidelity Bank account ending 9785, held in the name of a law firm with initials LL&H LLC |
| 15 | 10/31/2017 | Cashier's check in the amount of approximately $58,250 drawn from Wells Fargo account ending 3037, held in the name of RYAN FELTON, and made payable to Carl Black Kennesaw |

13

| Count | Date (On or about) | Monetary Transaction |
|-------|--------------------|----------------------|
| 16 | 11/3/2017 | Wire transfer in the amount of approximately $1,008,799 from Wells Fargo account ending 3037, held in the name of RYAN FELTON, to Fidelity Bank account ending 9785, held in the name of a law firm with initials LL&H LLC |
| 17 | 11/24/2017 | Cashier's check in the amount of approximately $180,000 drawn from Wells Fargo account ending 3037, held in the name of RYAN FELTON, and made payable to S and W Cars, Inc., dba Ferrari of Atlanta |
| 18 | 12/4/2017 | Wire transfer in the amount of approximately $199,767 from Gemini account controlled by RYAN FELTON to Wells Fargo account ending 3037, held in the name of RYAN FELTON |
| 19 | 12/4/2017 | Check in the amount of approximately $16,585 drawn from Wells Fargo account ending 3037, held in the name of RYAN FELTON, and made payable to H&A International |
| 20 | 12/24/2017 | Check in the amount of approximately $15,635 drawn from Wells Fargo account ending 3037, held in the name of RYAN FELTON, and made payable to H&A International |

All in violation of Title 18, United States Code, Section 1957 and Section 2.

## Count Twenty-One
15 U.S.C. §§ 78j(b) & 78ff and 17 C.F.R. § 24.10b-5
(Securities Fraud Relating to FLiK)

53. The Grand Jury re-alleges and incorporates by reference Paragraphs 2 through 49 of this Indictment as if fully set forth herein.

54. Beginning on a date unknown to the Grand Jury, but from at least in or about August 2017, and continuing through at least in or about August 2018, in

14

the Northern District of Georgia and elsewhere, the defendant, RYAN FELTON, aided and abetted by others known and unknown to the Grand Jury, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails and facilities of national securities exchanges, did use and employ, and cause to be used and employed, and did aid and abet the employment of manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing at least one device, scheme, and artifice to defraud; (b) making at least one untrue statement of material fact and omitting to state material facts necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in at least one act, practice, and course of business that operated and would operate as a fraud and deceit upon any person, in connection with the purchase and sale of FLiK tokens.

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.

**Counts Twenty-Two through Twenty-Five**
18 U.S.C § 1343
(Wire Fraud Relating to CoinSpark)

55. The Grand Jury re-alleges and incorporates by reference Paragraphs 2 through 11 of this Indictment as if fully set forth herein.

56. Beginning on a date unknown to the Grand Jury, but from at least in or about September 2017, and continuing through at least in or about August 2018,

15

in the Northern District of Georgia and elsewhere, the defendant, RYAN
FELTON, aided and abetted by others known and unknown to the Grand Jury,
did knowingly devise and intend to devise a scheme and artifice to defraud
others, and to obtain money and property by means of materially false and
fraudulent pretenses, representations, and promises, as well as by omission of
material facts.

### The CoinSpark Scheme to Defraud

57. Beginning on a date unknown to the Grand Jury, but from at least in or
about September 2017, and continuing through at least in or about August 2018,
FELTON, and others known and unknown to the Grand Jury, made false
statements to investors and prospective investors in a unique cryptocurrency
coin he created called "Spark Coin," including, but not limited to, false
statements concerning how proceeds of their investments would be used and the
large amount of other investments in the entity.  FELTON made these false
statements to induce individuals to invest in Spark coins in order to increase, or
pump, the price of the Spark coins so that FELTON could sell, or dump, on
cryptocurrency exchanges all of the Spark coins that he secretly held at an
inflated price.

58. Beginning in or about September 2017, FELTON, and others known and
unknown to the Grand Jury, promoted the creation of an entity named
CoinSpark.  CoinSpark was advertised as a newly developed cryptocurrency
trading exchange that would launch in April 2018 and be twenty-five percent
owned by investors.

16

59. FELTON claimed that CoinSpark was "domiciled" outside of the United States in the Cayman Islands as part of another entity created by FELTON named Cypherblock.

60. Beginning in or about January 2018, and continuing through on or about March 14, 2018, FELTON promoted a CoinSpark ICO to offer "the opportunity for everyone to own a piece of our exchange."

61. FELTON used social media platforms, including Twitter, Facebook, and Telegram, and CoinSpark's website at the web address www.coinspark.io, to solicit investors for the CoinSpark ICO.

62. FELTON published written materials on the internet purporting to explain the investment. In general, these materials told investors that their investment would entitle them to "own a piece" of CoinSpark. By purchasing Spark coins, the investors would be entitled to receive a quarterly dividend payment based on CoinSpark's quarterly net profits.

63. After the ICO ended, however, FELTON, and others known and unknown to the Grand Jury, informed investors that there would be no dividend payment and, instead, the Spark coins only entitled investors to discounts on trading fees on the CoinSpark trading exchange.

64. FELTON secretly diverted the investor funds raised in the CoinSpark ICO for his own personal use, including to fund his everyday living expenses.

65. The CoinSpark exchange actually went live, but the volume traded on the exchange was nominal to nonexistent.

66. FELTON gained approximately $300,000 to $400,000 as a result of this scheme.

*Misrepresentations in the CoinSpark Whitepaper and on Social Media*

67. In or about January 2018, FELTON distributed a document referred to as the CoinSpark whitepaper on the CoinSpark website at www.coinspark.io. The whitepaper contained false and misleading representations.  For example, the whitepaper represented that "CoinSpark is selling twenty-five percent (25%) of the exchange to the general public via our ICO."

68. The whitepaper further falsely represented to investors that the "Spark coin will entitle coin holders to receive a quarterly dividend of twenty-five percent (25%) of CoinSpark's quarterly net profits.  Once per quarter, twenty-five percent (25%) of the CoinSpark net profits will be sent proportionally to Spark coin holders."

69. The whitepaper further falsely represented to investors that "the Spark coin will be tradable on the CoinSpark exchange."

70. The whitepaper further falsely represented to investors that "any unsold Spark coins will be reclaimed by CoinSpark."

71. According to the whitepaper, the ICO would begin on February 14, 2018 and would conclude on March 14, 2018.  Spark coins were to be distributed on April 14, 2018.  The CoinSpark platform would begin trading on June 1, 2018.

72. FELTON, and others known and unknown to the Grand Jury, made additional materially false and misleading representations on CoinSpark's social media platforms to promote the ICO.

18

73. In the CoinSpark chat room on Telegram, in or about January 2018, FELTON, and others known and unknown to the Grand Jury, represented to investors and prospective investors that "[i]f you hold SPARK for a week then sell it, you still get a week's worth of dividend payment for that quarter when payments go out.  Multiple people could buy and sell the same SPARK tokens during the quarter and they will all get their share in the end, based on days held during the quarter.  While this doesn't mean more FREQUENT payments, it does eliminate any requirement to hold the coin in your portfolio if you don't want it and not lost [sic] your dividends earned up to that point."

74. FELTON, and others known and unknown to the Grand Jury, further represented to investors and prospective investors on Telegram that "[a]ny unsold SPARK tokens of the 25,000,000 that exist will remain with CoinSpark since they represent an actual portion of the exchange."

75. FELTON, and others known and unknown to the Grand Jury, further represented to investors and prospective investors on various websites that the CoinSpark ICO was not open to United States investors, unless they qualified as "accredited investors," that is, unless FELTON approved their investment.

76. In or about February 2018, in response to questions posted from investors and prospective investors about the use of the Spark coins on Telegram, FELTON, and others unknown and known to the Grand Jury, posted: "The exchange is funded and opening in April regardless of ICO results.  While it will be good to have a group of SPARK owners with a real interest in seeing the exchange succeed, the launch of the exchange itself does not depend on the ICO.

19

The main benefit of a successful ICO will be to offset short term startup costs and provide liquidity for the faster addition of more tradable tokens."

77. On or about February 11, 2018, FELTON, and others known and unknown to the Grand Jury, further represented to investors and prospective investors on Telegram: "The ICO raise is NOT the only investment made into launching COINSPARK. Millions have been invested thus far, which is the only reason we can guarantee the exchange will open in April regardless of the ICO. If the ICO were the only seed money it is likely the exchange would not be able to launch until closer to July, and only then if the ICO were a 100% sell out."

78. FELTON, and others known and unknown to the Grand Jury, also created fake accounts on Telegram to further bolster the credibility of the CoinSpark ICO. Specifically, FELTON, and others known and unknown to the Grand Jury, posed as real prospective investors who were excited about the opportunity to invest in CoinSpark and tried to convince others in the forum that the purchase of Spark coins was a legitimate and lucrative investment.

79. Besides posting under fake profiles, FELTON posted a glowing review about the CoinSpark ICO on the website www.medium.com, under the name, "Michael Taylor." The review began: "This is my personal review of the CoinSpark ICO. In this review I will do my best to provide insight and personal thoughts regarding CoinSpark, and why I believe this is an attractive ICO opportunity."

80. FELTON further represented as "Michael Taylor": "It's clear that CoinSpark has some deep financial resources. In order to launch an exchange,

20

provide exchange liquidity, develop a marketing plan, and conduct and [sic] ICO is not cheap.  It can cost millions (even tens of millions) of dollars to do what CoinSpark is already doing."

81. The "Michael Taylor" review concluded that CoinSpark was a "solid ICO investment" that "Michael Taylor" was "certainly going to partake in."

82. The whitepaper and statements made on various CoinSpark social media sites, including the posts under fake names, were false.  As FELTON then well knew, millions of dollars had not been invested in the CoinSpark platform prior to the ICO.  In addition, FELTON actively solicited United States investors and intended to, and did, approve their purchases of Spark coins during the CoinSpark ICO.  Moreover, FELTON did not intend to keep all unsold Spark coins within the CoinSpark exchange, but intended to, and did, secretly offer the Spark coins for sale on secondary markets.

*The Omission of Material Facts as to FELTON's involvement in CoinSpark*

83. FELTON also omitted materials facts from the CoinSpark written materials to mislead investors and prospective investors.  For example, FELTON purposely did not disclose his name or involvement in the CoinSpark exchange or ICO.

84. There were no individuals' names listed on any of the CoinSpark written materials.

85. Before and after the ICO, investors and prospective investors repeatedly inquired about the identity of the CoinSpark team on its various social media platforms.

86. FELTON, and others known and unknown to the Grand Jury, refused to disclose FELTON's involvement in CoinSpark, claiming that safety concerns prevented the disclosure of the team: "For various reasons, detailed team information is not public at this time. Recent events have created safety concerns that must be addressed to protect the members of the team and the assets of the exchange users and SPARK holders."

87. On public forums, such as Telegram, investors also began to question whether FLiK and FELTON were involved with CoinSpark. Using an account under a fake name, FELTON falsely denied that anyone from FLiK was involved in CoinSpark. FELTON also directed others associated with CoinSpark to post the same false denials.

88. FELTON attempted to assuage investors' concerns about the identity of the CoinSpark team through other means. For example, in or about early February 2018, FELTON announced on the CoinSpark website and on its various social media platforms, including Telegram, that CoinSpark had "selected" the accounting firm, Ernst & Young, to audit CoinSpark: "We have selected EY to provide external audit services for our token holders. Because SPARK tokens will pay a quarterly dividend to our token holders, we felt it was necessary to provide world-class external assurance services to verify our accounting and subsequent dividend payments. EY will perform an external audit (also known as Assurance Services) of the CoinSpark financials twice per year to ensure that our financials are in accordance with FASB (Financial Accounting Standards

Board) IASB (International Accounting Standards Board) and U.S. GAAP (United States Generally Accepted Accounting Principles)."

89. The purported relationship with Ernst & Young was false.  As FELTON then well knew, CoinSpark had neither retained nor hired Ernst & Young in any capacity.

90. Based in whole or in part on material misrepresentations and omissions made by FELTON, numerous investors purchased Spark coins in the ICO and on secondary cryptocurrency markets.

*Trading Activity and Pumping of the Spark Coins*

91. The CoinSpark ICO began on or about February 14, 2018, and ended on or about March 14, 2018.  Investor cryptocurrency funds were deposited into cryptocurrency address, beginning 0xf958.

92. The equivalent of approximately $200,000 was raised on the first day of the ICO.

93. Shortly after the ICO ended, FELTON announced to others associated with the operation of CoinSpark that he was considering removing the most attractive feature of the Spark coins that had been heavily promoted before the ICO — the quarterly dividend payment that allowed investors to "own a piece" of CoinSpark.

94. On or about July 1, 2018, FELTON announced on the CoinSpark website, in a post entitled "Spark Token Update & Burn Schedule," that CoinSpark would not pay dividends to investors as had been promised: "After extensive consultation with our legal team, founders, management team, and many in the

23

community, we believe it is vital for our success and mission statement to maintain the utmost integrity and customer security by setting out the functionality of the Spark token."

95. This post offered investors who had participated in the ICO the option of returning their Spark coins purchased during the ICO for a full refund.

96. However, FELTON placed conditions on the refund that made it almost impossible for any investor to redeem, stating that the investors "must return *all* of your Spark tokens, including any bonus tokens you received during our token sale. Additionally, this option is only available to token holders that acquired Spark directly from our token sale." FELTON explicitly refused to refund any United States investors, claiming that they should not have been able to invest in the ICO at all. As a result, very few investors received a refund.

97. The representations made in these written materials were false. As FELTON then well knew, he did not have extensive consultations with a "legal team, founders, management team, and many in the community" before he decided to eliminate the dividend after investors had purchased Spark coins during the ICO and on the secondary cryptocurrency market precisely because of the dividend.

### Execution of the Scheme

98. On or about each date listed below, in the Northern District of Georgia and elsewhere, for the purpose of executing and attempting to execute the aforesaid scheme and artifice to defraud, and to obtain money and property as set out in Paragraphs 57 through 97 above, the defendant, RYAN FELTON, did, with

intent to defraud, knowingly cause to be transmitted in interstate and foreign commerce, by means of wire communication, certain writings, signs, signals, and sounds, that is, wire transfers of cryptocurrency as part of the CoinSpark ICO, as follows:

| Count | Date (On or about) | Initials of Investor | Transaction |
|---|---|---|---|
| 22 | 2/14/2018 | M.Z. | Purchase of 13,200 Spark coins for 22 Ether wired from Ethereum wallet beginning 0x659c to Spark Coin address beginning 0xf958 |
| 23 | 2/14/2018 | B.P. | Purchase of 420 Spark coins for 0.7 ether wired from Ethereum wallet beginning 0xf147 to Spark Coin address beginning 0xf958 |
| 24 | 2/20/2018 | D.D. | Purchase of 52,791 Spark coins for 87.985 ether wired from Ethereum wallet beginning 0xbdf0 to Spark Coin address beginning 0xf958 |
| 25 | 2/21/2018 | D.D. | Purchase of 2,835 Spark coins for 4.725 ether wired from Ethereum wallet beginning 0xbdf0 to Spark Coin address beginning 0xf958 |

All in violation of Title 18, United States Code, Section 1343 and Section 2.

**Counts Twenty-Six through Twenty-Seven**
18 U.S.C. § 1957
(Money Laundering Relating to CoinSpark)

99. The Grand Jury re-alleges and incorporates by reference Paragraphs 2 through 11 and 57 through 97 of this Indictment as if fully set forth herein.

100.    On or about each date listed below, in the Northern District of Georgia
and elsewhere, the defendant, RYAN FELTON, aided and abetted by others
known and unknown to the Grand Jury, did knowingly engage and attempt to
engage in the following monetary transactions by, through, and to a financial
institution, affecting interstate and foreign commerce, each such transaction
knowingly involving criminally derived property of a value greater than $10,000,
such property having been derived from a specified unlawful activity, that is,
wire fraud based on the aforementioned sale of Spark coins, in violation of Title
18, United States Code, Section 1343:

| Count | Date (On or about) | Monetary Transaction |
|---|---|---|
| 26 | 3/20/2018 | Transfer of 100 Ether from Gemini account controlled by RYAN FELTON to Bittrex account held in the name of RYAN FELTON. |
| 27 | 6/16/2018 | Wire transfer in the amount of approximately $99,632 from Gemini account controlled by RYAN FELTON to Wells Fargo account ending 3037, held in the name of RYAN FELTON. |

All in violation of Title 18, United States Code, Section 1957 and Section 2.

**Count Twenty-Eight**
15 U.S.C. §§ 78j(b) & 78ff and 17 C.F.R. § 24.10b-5
(Securities Fraud Relating to CoinSpark)

101.    The Grand Jury re-alleges and incorporates by reference Paragraphs 2
through 11 and 57 through 97 of this Indictment as if fully set forth herein.

102.    Beginning on a date unknown to the Grand Jury, but from at least in or
about September 2017, and continuing through at least in or about August 2018,

26

in the Northern District of Georgia and elsewhere, the defendant, RYAN
FELTON, aided and abetted by others known and unknown to the Grand Jury,
willfully and knowingly, directly and indirectly, by use of the means and
instrumentalities of interstate commerce, the mails and facilities of national
securities exchanges, did use and employ, and cause to be used and employed,
and did aid and abet the employment of manipulative and deceptive devices and
contrivances, in violation of Title 17, Code of Federal Regulations, Section
240.10b-5, by (a) employing at least one device, scheme and artifice to defraud;
(b) making at least one untrue statement of material fact and omitting to state
material facts necessary in order to make the statement made, in the light of the
circumstances under which they were made, not misleading; and (c) engaging in
at least one act, practice, and course of business that operated and would operate
as a fraud and deceit upon any person,  in connection with the purchase and sale
of Spark coins.

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title
17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States
Code, Section 2.

### Forfeiture

103.    Upon conviction of one or more of the offenses alleged in Counts One
through Twelve, Twenty-One through Twenty-Five, and Twenty-Eight of this
Indictment, the defendant, RYAN FELTON, shall forfeit to the United States of
America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title
28, United States Code, Section 2461, any property, real or personal, which

27

constitutes or is derived from proceeds traceable to said violations.  The property to be forfeited includes the following:

 a. MONEY JUDGMENT: A sum of money in United States currency, representing the amount of proceeds obtained as a result of the offenses alleged in Counts One through Twelve, Twenty-One through Twenty-Five, and Twenty-Eight of this Indictment.

 b. VEHICLE: One 2017 Chevrolet Tahoe, Vehicle Identification Number 1GNSCBKC3HR401432.

 c. REAL PROPERTY: 75 Abington Court, NW, Atlanta, Georgia, 30327, and All Buildings, Appurtenances, Improvements and Attachments Thereon.

104. Upon conviction of one or more of the offenses alleged in Counts Thirteen through Twenty and Twenty-Six through Twenty-Seven of this Indictment, the defendant, RYAN FELTON, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in such offense, or any property traceable to such property.  The property to be forfeited includes the following:

 a. MONEY JUDGMENT: A sum of money in United States currency, representing the amount of proceeds obtained as a result of the offenses alleged in Counts Thirteen through Twenty and Twenty-Six through Twenty-Seven of this Indictment.

 b. VEHICLE: One 2017 Chevrolet Tahoe, Vehicle Identification Number 1GNSCBKC3HR401432.

c.  REAL PROPERTY: 75 Abington Court, NW, Atlanta, Georgia, 30327, and All Buildings, Appurtenances, Improvements and Attachments Thereon.

105.  If, as a result of any act or omission of the defendant, any property subject to forfeiture:

a.  cannot be located upon the exercise of due diligence;

b.  has been transferred or sold to, or deposited with, a third party;

c.  has been placed beyond the jurisdiction of the Court;

d.  has been substantially diminished in value; or

e.  has been commingled with other property which cannot be subdivided without difficulty;

the United States of America intends, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c)

//

//

//

and Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property.

A ___TRUE___ BILL

_____
FOREPERSON

BYUNG J. PAK
  *United States Attorney*

NATHAN P. KITCHENS
  *Assistant United States Attorney*
Georgia Bar No. 263930

SEKRET T. SNEED
  *Assistant United States Attorney*
Georgia Bar No. 252939

600 U.S. Courthouse
75 Ted Turner Drive SW
Atlanta, GA 30303
404-581-6000; Fax: 404-581-6181