THE FOLLOWING IS THE PDF OF AN OFFICIAL TRANSCRIPT.

OFFICIAL TRANSCRIPTS MAY ONLY BE FILED IN CM/ECF BY THE OFFICIAL

COURT REPORTER AND WILL BE RESTRICTED IN CM/ECF FOR A PERIOD OF 90

DAYS.  YOU MAY CITE TO A PORTION OF THE ATTACHED TRANSCRIPT BY THE

DOCKET ENTRY NUMBER, REFERENCING PAGE AND LINE NUMBER, ONLY AFTER

THE COURT REPORTER HAS FILED THE OFFICIAL TRANSCRIPT; HOWEVER, YOU

ARE PROHIBITED FROM ATTACHING A FULL OR PARTIAL TRANSCRIPT TO ANY

DOCUMENT FILED WITH THE COURT.

```
1                    UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF GEORGIA
2                           ATLANTA DIVISION

3

4   UNITED STATES OF AMERICA, )
                              )
5                             )
     -VS-                     ) DOCKET NO. 1:20-CR-347-JPB
6                             ) VOLUME 1 OF 3
    RYAN FELTON,              )
7                             )
          DEFENDANT.          )
8

9                 TRANSCRIPT OF JURY TRIAL PROCEEDINGS
                   BEFORE THE HONORABLE J.P. BOULEE
10                  UNITED STATES DISTRICT JUDGE
                           JULY 11, 2022
11

12

13

14  APPEARANCES:

15  ON BEHALF OF THE GOVERNMENT:
          NATHAN PARKER KITCHENS, ESQ.
16        SEKRET T. SNEED, ESQ.
          ASSISTANT UNITED STATES ATTORNEYS
17

18  ON BEHALF OF THE DEFENDANT:
          JOSHUA S. LOWTHER, ESQ.
19        KATRYNA LYN SPEARMAN, ESQ.

20

21

22

    STENOGRAPHICALLY RECORDED BY:
23

                         PENNY PRITTY COUDRIET, RMR, CRR
24                          OFFICIAL COURT REPORTER
                         UNITED STATES DISTRICT COURT
25                            ATLANTA, GEORGIA
```

1                              I N D E X

2
   **WITNESS:**                                          **PAGE:**
3
   1.   JOSEPH STITES

4
            DIRECT EXAMINATION..............................25
5

6  2.   RUSSELL CASTILLO

7           DIRECT EXAMINATION..............................43

8
   3.   CARLOS MARTINEZ
9
            DIRECT EXAMINATION..............................60
10          CROSS-EXAMINATION...............................75

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1          (PROCEEDINGS HELD IN OPEN COURT AT 9:38 A.M., ATLANTA)

 2                          (Court Announced)

 3          COURTROOM DEPUTY CLERK:  The Court has set aside time

 4   for a jury trial in the case United States v. Felton, Case Number

 5   1:20-CR-347.

 6          Counsel, will you all make your appearances for the

 7   record, please.

 8          MR. KITCHENS:  Good morning, your Honor, AUSA Nathan

 9   Kitchens.  And I'm here with AUSA Sekret Sneed on behalf of the

10   government.

11          THE COURT:  Good to see both of you.

12          MR. LOWTHER:  Good morning, your Honor.  Joshua Lowther,

13   I'm here with Ms. Katryna Spearman for Mr. Felton.  He's present

14   at the defense table with us.

15          THE COURT:  Good to see all of you as well.

16          I don't think we have a lot to discuss before we bring

17   up the jury.

18          Do we know if the jury is ready to be brought up?

19          COURTROOM DEPUTY CLERK:  Yes.  And I've already told

20   them to come down and wait.

21          THE COURT:  I think there was at least an issue with

22   documents and whether there was going to be an agreement with

23   documents.  Did y'all work that out?

24          MR. KITCHENS:  We did, your Honor.  So we have a

25   stipulation with the defense for -- and this would go
```

 1  Rule 902(11).  So I can provide that to the government.  It's been

 2  agreed to by the parties that we would stipulate to the

 3  authenticity of the business records with business records

 4  certification.  So I can provide that to the Court.

 5          THE COURT:  Okay.  Thank you.

 6          And, remind me, were there any other stipulations in

 7  this case?

 8          MR. KITCHENS:  We have also reached a couple additional

 9  stipulations.  The defense has been very reasonable on those.  As

10  a result of that, we've been able to limit some of the

11  witnesses -- eliminate some of the witnesses we previously had

12  anticipated a couple weeks ago that we would have to call.  So we

13  won't -- we'll be -- at the appropriate time during trial we'll

14  read out those stipulations to the jury.

15          THE COURT:  Okay.

16          MR. KITCHENS:  One other thing to note as part of

17  pairing down the witness list, there is one of the individuals

18  that's listed in the indictment as having a transaction, and this

19  is in Count 23 of the indictment, it's the individual with the

20  initials BP.  He is located in the United Kingdom.  We have tried

21  to arrange his travel and it is something that he is not able to

22  travel for purposes of this trial.  As a result of that, and I've

23  discussed that with the defense, it's our intention that we would

24  dismiss that count.  That's Count 23 relating to BP.

25          So what we would anticipate doing is for the indictment

```
 1  itself, we could present a redacted version of the indictment that
 2  would just black out that row of the charges.  And this is on page
 3  25 of the indictment.
 4          THE COURT:  So then if I'm listing the charges, I would
 5  say instead of Counts 22 through 25 of wire fraud, it would be 22
 6  through 24 of wire fraud, then 25 through 26 of money laundering
 7  and Count 27 of securities fraud?
 8          MR. KITCHENS:  That seems correct, your Honor.
 9          THE COURT:  Anything else from either side before we
10  bring in the jury?
11          MR. KITCHENS:  I don't think --
12          THE COURT:  Potential jurors.
13          MR. KITCHENS:  I don't think there's really anything
14  more from the government.  But I would just say based on kind of
15  the combination of those stipulations as well as our efforts to
16  pair down the trial schedule, just to inform the Court we would
17  anticipate, I think, that the trial will likely end on Thursday.
18  So I think we've shaved off a day from what we had anticipated at
19  the pretrial conference.
20          THE COURT:  Do you agree?
21          MR. LOWTHER:  We have nothing further from our side.
22  And we do agree that this trial should conclude on Thursday.
23          THE COURT:  Okay.  Thank you, counsel.
24          All right.  And, obviously, I've got folks normally that
25  would be back in the gallery in the jury box to make more room for
```

 1  our potential jurors.

 2          All right.  Ms. Oduka, if we can please bring in the

 3  panel.

 4          (Jury voir dire commenced)

 5          (Whereupon the jury was duly sworn)

 6          COURTROOM DEPUTY CLERK:  Thank you.  You all can be

 7  seated.

 8          THE COURT:  Now that you've been sworn, I need to

 9  explain some basic principles about the criminal trial and your

10  duty as jurors.  These are my preliminary instructions to you.  At

11  the end of the trial I will give you more detailed instructions.

12          It will be your duty to decide what happened so you can

13  determine whether the defendant is guilty or not guilty of the

14  crimes charged in the indictment.  At the end of the trial, I will

15  explain the law that you must follow to reach your verdict.  You

16  must follow the law as I explain it to you even if you do not

17  agree with the law.

18          You must decide the case solely on the evidence

19  presented here in the courtroom.  Evidence can come in many forms.

20  It can be testimony about what someone saw or heard or smelled.

21  It can be an exhibit admitted into evidence.  It can be someone's

22  opinion.

23          Some evidence proves a fact indirectly, such as a

24  witness who saw wet grass outside and people walking into the

25  courthouse carrying wet umbrellas.

1          Indirect evidence, sometimes called circumstantial

2 evidence, is simply a chain of circumstances that proves a fact.

3 As far as the law is concerned, it makes no difference whether

4 evidence is direct or indirect.  You may choose to believe or

5 disbelieve either kind and should give every piece of evidence

6 whatever weight you think it deserves --

7          Certain things are not evidence and must not be

8 considered as such.  I'll list them for you now.

9          Statements and arguments of the lawyers.  In their

10 opening statements and closing arguments the lawyers will discuss

11 the case, but their remarks are not evidence.

12          Questions and objections of the lawyers.  The lawyers'

13 questions are not evidence.  Only the witness's answers are

14 evidence.  You should not think that something is true just

15 because a lawyer's question suggests that it is.

16          For instance, if a lawyer asks a witness, You saw the

17 defendant hit his sister, didn't you, that question is no evidence

18 whatsoever of what the witness saw or what the defendant did

19 unless the witness agrees with it.

20          There are rules of evidence that control what can be

21 received into evidence.  When a lawyer asks a question or offers

22 an exhibit and a lawyer on the other side thinks that it is not

23 permitted by the rules of evidence, that lawyer may object.

24          If I overrule the objection, then the question may be

25 answered or the exhibit received into evidence.

1          If I sustain the objection, then the question cannot be
2  answered and the exhibit cannot be received.
3          Whenever I sustain an objection to the question, you
4  must ignore the question and not try to guess what the answer
5  would have been.
6          Sometimes I may order that evidence be stricken and that
7  you disregard or ignore the evidence.  That means that when you're
8  deciding the case, you must not consider that evidence.
9          Some evidence is admitted only for a limited purpose.
10  When I instructed you that an item of evidence has been admitted
11  for a limited purpose, you must consider it only for that limited
12  purpose and no other.
13          In reaching your verdict you may have to decide what
14  testimony to believe and what testimony not to believe.  You may
15  believe everything a witness says or part of it or none of it.  In
16  considering the testimony of any witness, you may take into
17  account the opportunity and ability of the witness to see or hear
18  or know the things testified to, the witness's memory, the
19  witness's manner while testifying, the witness's interest in the
20  outcome of the case and any bias or prejudice, whether other
21  evidence contradicted the witness's testimony, the reasonableness
22  of the witness's testimony in light of all the evidence, and any
23  other factors that bear on believability.  I will give you
24  additional guidelines for determining credibility of witnesses at
25  the end of the case.

1          As you know, this is a criminal case.  There are three

2  basic rules about a criminal case that you must keep in mind:

3          First, the defendant is presumed innocent until proven

4  guilty.  The indictment against the defendant brought by the

5  government is only an accusation, nothing more.  It is not proof

6  of guilt or anything else.  The defendant, therefore, starts out

7  with a clean slate.

8          Second, the burden of proof is on the government until

9  the very end of the case.  The defendant has no burden to prove

10  his innocence or to present any evidence or to testify.  Since the

11  defendant has the right to remain silent and may choose whether to

12  testify, you cannot legally put any weight on a defendant's choice

13  not to testify.  It is not evidence.

14          Third, the government must prove the defendant's guilt

15  beyond a reasonable doubt.  I will give you further instructions

16  on this point later but bear in mind that the level of proof

17  required is high.

18          Our law requires jurors to follow certain instructions

19  regarding their personal conduct in order to help assure a just

20  and fair trial.  I will now give you those instructions.

21          Do not talk either among yourselves or with anyone else

22  about anything related to this case.  You may tell the people with

23  whom you live and your employer that you are a juror and give them

24  information about when you will be required to be in court, but

25  you may not discuss with them or anyone else anything related to

1 | this case.

2 |         Do not at any time during the trial request, accept,

3 | agree to accept or discuss with any person any type of payment or

4 | benefit in return for supplying any information about the trial.

5 | You must promptly tell me about any incident you know of involving

6 | an attempt by any person to improperly influence you or any member

7 | of the jury.

8 |         Do not visit or view the premises or place where the

9 | charged crime was allegedly committed or any other premises or

10 | place involved in the case.  And you must not use Internet maps or

11 | Google Earth or any other program or device to search for a view

12 | of any location discussed in the testimony.

13 |         Do not read, watch or listen to any accounts or

14 | discussions related to this case which may be reported by

15 | newspaper, television, radio, the Internet or any other news

16 | media.

17 |         Do not attempt to research any fact, issue or law

18 | related to this case, whether by discussions with others, by the

19 | library or Internet research or by any other means or source.

20 |         In this age of instant electronic communication and

21 | research I want to emphasize that in addition to not talking face

22 | to face with anyone about the case, you must not communicate with

23 | anyone about the case by any other means, including by telephone,

24 | text message, e-mail, Internet chat, chat rooms, blogs or social

25 | networking websites and apps such as Facebook, Instagram,

1  Snapchat, YouTube, Twitter or et cetera.  You may not use any

2  similar technology of social media even if I have not specifically

3  mentioned it here.

4          You must not provide any information about the case

5  to anyone by any means whatsoever.  And that includes posting

6  information about the case or what you are doing in the case on

7  any device or Internet site, including blogs, chat rooms, social

8  websites or any other means.

9          You also must not use Google or otherwise search for any

10 information about the case or the law that applies to this case or

11 the people involved in the case, including the defendant, the

12 witnesses, the lawyers or the judge.  It's important that you

13 understand why these rules exist and why they're important.

14         Our law does not permit jurors to talk with anyone else

15 about the case or to permit anyone to talk to them about the case

16 because only jurors are authorized to render a verdict.  Only you

17 have been found to be fair and only you have promised to be fair.

18 No one else is so qualified.

19         Our law does not permit jurors to talk among themselves

20 about the case until the Court tells them to begin deliberations

21 because premature discussions can lead to a premature final

22 decision.  Again, do not talk with other jurors about the case

23 until the Court tells you to begin deliberations.

24         Our law also does not permit you to visit a place

25 discussed in the testimony.  First, you can't be sure that the

1  place is in the same condition as it was on the day in question.

2  Second, even if it were in the same condition, once you

3  go to a place discussed in the testimony to evaluate the evidence

4  in light of what you see, you become a witness, not a juror.

5  As a witness, you may now have a mistaken view of the

6  scene that neither party may have a chance to correct and that

7  wouldn't be fair.

8  Finally, our law requires that you not read or listen to

9  any news account of the case and that you not attempt to research

10  any fact, issue or law related to the case.  Your decision must be

11  based solely on the testimony and other evidence presented in this

12  courtroom.

13  Also, the law often uses words and phrases in special

14  ways, so it's important that any definitions you hear come only

15  from me and not from any other source.  It wouldn't be fair to the

16  parties for you to base your decision on some reporter's view or

17  opinion or other information you acquire outside the courtroom.

18  These rules are designed to help guarantee a fair trial.

19  And our law accordingly sets forth serious consequences if the

20  rules are not followed.  I trust that you understand and

21  appreciate the importance of following these rules.  And in accord

22  with your oath and promise, I know that you will do so.

23  Moving now, if you wish, you may take notes to help you

24  remember what a witness has said.  If you do take notes, please

25  keep them to yourself until you and your fellow jurors go to the

1  jury room to decide the case.  Do not let note-taking distract you

2  so that you do not hear other answers by the witnesses.  When you

3  leave the courtroom, your notes should be left in the jury room.

4          Whether or not you take notes, you should rely on your

5  own memory of what was said.  Notes are to assist your memory

6  only.  They are not entitled to any greater weight than your

7  memory or impression about the testimony.

8          The trial will begin shortly.  First, the government

9  will make an opening statement, which is simply an outline to help

10 you understand the evidence as it comes in.

11         Next, the defense attorney may but does not have to make

12 an opening statement.

13         Opening statements are neither evidence nor argument.

14         The government would then present its witnesses, and

15 counsel for the defendant may cross-examine them.

16         Following the government's case, the defendant may, if

17 he wishes, present witnesses whom the government may

18 cross-examine.

19         After all the evidence is in, the attorneys will present

20 their closing arguments to summarize and interpret the evidence

21 for you.  And I will instruct you on the law.

22         After that, you will go to the jury room to decide your

23 verdict.

24         Counsel, as far as your witnesses, other than those that

25 have been previously discussed, does anyone wish to invoke the

1  rule?

2          MR. KITCHENS:  No, your Honor, I think that's it.

3          MR. LOWTHER:  No, your Honor.

4          THE COURT:  Mr. Kitchens or Ms. Sneed, are you ready to

5  give your opening statement?

6          MS. SNEED:  Yes, your Honor.  And if it's all right with

7  the Court, I would like to move the podium.

8          THE COURT:  That's fine.  Move it wherever you would

9  like.

10          MS. SNEED:  May it please the Court.

11          Members of the jury, good afternoon.  As you may recall

12  from earlier today, I am Assistant United States Attorney Sekret

13  Sneed, and I represent the United States of America.

14          This is a case about fraud.  The evidence will show that

15  for a one-year period, from 2017 to 2018, the defendant, Ryan

16  Felton, defrauded the public into giving him money for two

17  different cryptocurrency focused projects.  Investors gave him a

18  combined total of over $2.5 million.

19          And instead of using that money to develop the projects

20  and to make them fully operational as the defendant promised

21  investors he would, he bought a $1.5 Million house in Buckhead

22  and a $180,000 Ferrari, a $60,000 Chevy Tahoe and diamonds.  And

23  the investors, the evidence will show that they were left with

24  cryptocurrency that is essentially worthless.

25          Now, I keep mentioning the term "cryptocurrency."  Most

1  of you may have at least heard of it, but if you do not know much

2  about it beyond knowing cryptocurrency exists, do not worry

3  because we will have witnesses who will explain all of that to

4  you.  You will hear a precise definition of cryptocurrency and how

5  the encryption that goes along with it allows people to trade it

6  for value.  But for our purposes right now in general

7  cryptocurrency is Internet money, a way to buy and sell things on

8  the Internet anonymously without using a United States dollar, a

9  British pound, a peso or another form of traditional paper money

10 which is collectively known as fiat money.

11         There are many, many types of cryptocurrency.  Some you

12 may have heard of such as Bitcoin or Ether.  Ultimately for right

13 now as you begin to hear the evidence just know that while the

14 method that the defendant used to defraud investors into giving

15 him money may have involved 21st Century technology, the heart of

16 what he did is as old as time; lying to people to take their

17 money.

18         As I mentioned earlier, you'll hear about two different

19 schemes perpetrated by the defendant; one involving a promised but

20 never developed streaming entertainment platform that was to be

21 called FLiK, F-L-I-K, and the second a promised but never fully

22 operational cryptocurrency exchange, which is like a stockmarket

23 for cryptocurrency on the Internet, called CoinSpark.

24         First let's discuss FLiK.  In August of 2017 the

25 defendant was working in the entertainment industry in Atlanta as

1  a film and television director and producer with his own company

2  called AVA Atlanta.  You'll hear from witnesses that around this

3  time the defendant began to talk about an idea for a streaming

4  platform like a NetFlix, but instead of like on NetFlix where a

5  large part of the content comes from major studios, the content

6  was supposed to come from small independent filmmakers and

7  creatives.  According to the defendant, this would mean that

8  instead of a big Hollywood studio providing the content or movies

9  and then taking most of the profits, smaller filmmakers would be

10  able to get funding and be able to distribute their movies all on

11  FLiK.  And to add a nice 21st Century twist, the public would pay

12  to access FLiK via a specific type of cryptocurrency called a FLiK

13  token.

14        The defendant boasted that FLiK would ultimately take on

15  NetFlix, but a start-up like that, building a company like a

16  NetFlix from nothing takes money and lots of it.  Instead of

17  finding a private investor to invest money in his project or

18  trying to bank for a loan, the defendant chose a unique

19  cryptocurrency tool, an initial coin offering, or an ICO, or a

20  crowd sale.

21        An ICO is a fund-raising event where a unique

22  newly-created coin or token, as the specific cryptocurrency is

23  called in this instance, is offered to the public for sale in

24  return for already established cryptocurrency.  It is kind of like

25  an IPO, or an initial public offering, when a stock is first

1   offered to the public for sale.

2          The defendant promoted the FLiK ICO all across the

3   Internet.  You will see the website that the defendant created for

4   FLiK.  You will also see the white paper, which you'll hear during

5   the trial is a publicly-available document that describes the

6   project for which the ICO is being conducted.  And the defendant

7   posted the white paper on the FLiK website and elsewhere on the

8   Internet.

9          You will see the post that the defendant made on message

10   boards aimed at investors, social media and cryptocurrency-focused

11   websites.

12          You will see where the defendant claimed that FLiK had a

13   large investment from a private investor of hundreds of thousands

14   of dollars; that TI, a globally-known rapper and actor based in

15   Atlanta, was a co-owner of FLiK; that the United States Military

16   had agreed to carry FLiK as a streaming platform available to

17   nearly 2 Million service members; and in a surprising move,

18   considering that the purpose of FLiK was to develop fund and

19   distribute small and independent films and content, that the

20   defendant was in serious talks with major Hollywood movie studios

21   and distributors to license their content for FLiK.

22          He also promised that any unsold FLiK tokens out of the

23   hundreds of thousands that he planned to make available for sale

24   during the ICO would be burned, which you will hear is a term used

25   in the cryptocurrency world to mean that the tokens would be

1   locked away in an account never to be sold or touched again.

2         The burn is a particularly important concept to some

3   investors because the less tokens on the market, the more valuable

4   the coins that exist on the market are.

5         The evidence will show that all of these promises and

6   representations by the defendant were false.  The evidence will

7   show that there was no private investor who gave hundreds of

8   thousands of dollars.  TI was not a co-owner.  There was no

9   agreement with the United States Military.  And there were no

10  agreements with major movie studios to put content on FLiK.  There

11  was no burn since the defendant failed to mention that he would be

12  keeping tens of millions of FLiK tokens after the ICO to dump on

13  the market and sell for his own profit.  And most importantly,

14  there was nothing concrete in development that could or would

15  become FLiK.

16        Specifically you'll hear from witnesses who know the

17  defendant, spoke with him about FLiK and know the truth about the

18  lack of any real progress on a FLiK streaming platform.  For

19  example, you'll hear from a representative of TI who spoke

20  repeatedly with the defendant about FLiK, a cryptocurrency

21  entrepreneur who the defendant identified as a third member of the

22  FLiK team, and a CEO of the company that the defendant claimed was

23  developing the streaming platform itself.  And you'll hear from

24  two individuals who were friends of the defendant who agreed to

25  take over FLiK after it repeatedly missed deadlines for the

1 supposed launch.  All of these witnesses will tell you that the

2 defendant's statements and promises to the public were lies.

3          Lastly, you will even hear from the defendant himself in

4 an interview with the FBI and from sworn testimony about FLiK

5 where he attempts to justify his representations to victim

6 investors.

7          The defendant conducted the ICO from August 20, 2017, to

8 September, 20, 2017.  You will hear from investors who were relied

9 on and was spurred by the defendant's tall tales that they

10 believed to be the truth.

11          We will show you how the cryptocurrency that ICO

12 investors paid to purchase FLiK tokens went into the FLiK

13 cryptocurrency account that only the defendant had access to, was

14 converted into United States dollars, into cash, and transferred

15 into a Wells Fargo bank account in the defendant's name.

16          We'll also show you how after the ICO, instead of

17 burning the unsold FLiK tokens as the defendant promised, the

18 defendant dumped large volumes of FLiK tokens for sale on

19 cryptocurrency exchanges named EtherDelta and CoinExchange.

20 You'll hear from more investors who also relied on the defendant's

21 misrepresentations and purchased FLiK tokens on these two

22 exchanges.

23          We will show you how this cryptocurrency paid by

24 investors after the ICO also was converted into United States

25 dollars and transferred to that same Wells Fargo bank account in

1  the defendant's name.  And you'll hear how the defendant used all

2  of that investor money from the ICO and after the ICO,

3  approximately $2.2 Million, to support his lavish lifestyle,

4  including paying all cash for the house in Buckhead, the Ferrari,

5  the Tahoe and the diamonds, while the investors, who believed the

6  defendant's lies, were left with worthless FLiK tokens since

7  without a FLiK streaming platform to use the FLiK token on, who

8  would want to buy it?

9          I mentioned that there were two schemes.  The second

10 scheme began around the end of 2017 and beginning of 2018.  When

11 the defendant falsely claimed to be working hard on FLiK, you will

12 hear that he began to talk about creating his own cryptocurrency

13 exchange called CoinSpark.  The defendant used the same old tricks

14 that he used in FLiK.  He created a website and promoted an ICO

15 for CoinSpark.  This time for sale in the ICO was a Spark coin,

16 which was another type of cryptocurrency created by the defendant

17 but designed specifically for use on the CoinSpark exchange.

18         The defendant represented in a white paper that he wrote

19 and published on the CoinSpark website that if investors bought

20 Spark coins during the ICO, they would be entitled to a dividend

21 or payout of 25 percent of the net profits that CoinSpark made

22 every three months.

23         You will see that as with FLiK, the defendant once more

24 built up anticipation on social media and cryptocurrency-focused

25 websites before the ICO was held.  And once more, these posts were

1  filled with misrepresentations and omissions.

2        You will see the post by the defendant and by others at

3  the defendant's direction filled with misleading information on

4  the CoinSpark website and CoinSpark dedicated-investor message

5  boards claiming, among other things, that a world-renowned

6  accounting firm would audit CoinSpark's finances giving the

7  project a false air of legitimacy.

8        You will hear how the defendant made certain that his

9  name and face were not publicized with CoinSpark at all.  You

10  will hear that part of the reason for that is because FLiK

11  investors had become loud and vocal on the Internet about the FLiK

12  scheme, and the defendant wanted to keep his involvement in

13  CoinSpark a secret.

14        You will also see an article that the defendant wrote

15  and published under a false name that spread information about the

16  supposed expertise and legitimacy of the unknown team running

17  Spark -- CoinSpark, even though the defendant knew exactly who was

18  running CoinSpark.

19        You will also hear that unlike with FLiK, in the

20  CoinSpark scheme the defendant put a layer between himself and the

21  investors.  Specifically, the defendant recruited two men who he

22  had worked with at AVA Atlanta to regurgitate his representations

23  about CoinSpark to the public.  Their names are Chance White and

24  Owen Smith.  Neither had any real experience with the

25  cryptocurrency world.  The defendant initially promised them that

1  they would have an almost equal stake in CoinSpark in return for

2  their work for him.  You will hear from Mr. White and Mr. Smith

3  that neither ever saw a single penny from the CoinSpark ICO or

4  from anything related to CoinSpark.

5          The defendant conducted the ICO from February 14th,

6  2018, to March 14th, 2018, and raised more than $100,000 from

7  investors.  You will hear that after the ICO ended and after the

8  defendant had taken investor cryptocurrency, the defendant then

9  backtracked on the major thing that had attracted investors, he

10 rescinded the offer of the quarterly dividend.

11         And same song, second verse, the evidence will show how

12 the cryptocurrency that investors sent to the CoinSpark account to

13 buy Spark coins ultimately was converted to US dollars and

14 transferred into the defendant's Wells Fargo account.  And the

15 investors, again, were left with nothing but worthless

16 cryptocurrency since without the fully-operational CoinSpark

17 exchange, there was nowhere really to use the Spark coin.

18         Now we've talked about the subject matter in this trial

19 and the evidence that we will put forth.  The last thing I want to

20 discuss with you are the charges in this case.

21         The defendant was charged with multiple counts of wire

22 fraud, multiple counts of money laundering and one count of

23 securities fraud as to the FLiK scheme.

24         The defendant also was charged with several counts of

25 wire fraud, several counts of money laundering and one count of

1 securities fraud as to the CoinSpark scheme.

2         At the end of all the evidence Judge Boulee will

3 instruct you on what exactly that means.  But for now, in order to

4 help you understand all the evidence there are a few things I want

5 to tell you about these charges.

6         First, wire fraud is using interstate or foreign wire

7 communications to carry out the scheme to defraud someone else.

8         Money laundering is engaging in a transaction involving

9 more than $10,000 that was obtained through wire fraud, knowing

10 that the money was from some criminal activity.

11         Securities fraud is making an untrue material statement

12 or omitting a material fact to defraud someone in connection with

13 a purchase and sale of a security.

14         Each of the counts in the indictment arises from a

15 different date of a wire transmission by an investor to purchase a

16 FLiK token or Spark coin or from a transaction by the defendant to

17 transfer funds derived from these wires, and you will hear about

18 that over the course of the trial.

19         Members of the jury, at the conclusion of the evidence

20 we will return to this spot and ask you to return the only verdict

21 that the evidence supports, and that's a verdict of guilty as to

22 all counts of the indictment.

23         Thank you for your attention.

24         THE COURT:  Go ahead.

25         MR. LOWTHER:  Good afternoon, ladies and gentlemen.

1  Again, my name is Joshua Lowther, along with Katryna Spearman.  We

2  represent Mr. Felton.

3          As the state pointed out, Mr. Felton starts in this case

4  with multiple counts of wire fraud, securities wire fraud and

5  money laundering.

6          Although the judge will give you the law at the end of

7  the case -- and, of course, only what he says about the law is

8  what you're to listen to, what you're to use -- fraud is

9  essentially obtaining money or property from someone because of a

10 lie.

11         If it's an electronic transaction, it's wire fraud.  If

12 it involves a security, it's securities fraud.

13         Money laundering is simply spending those unlawful

14 proceeds in some financial transaction over $10,000.  That's the

15 long and short of what the charges are.

16         The government has a burden in this case to prove beyond

17 a reasonable doubt each and every element of each and every one of

18 those offenses before you're authorized to find Mr. Felton guilty

19 of any of them.

20         What the evidence will show in this case is that he had

21 no intent to defraud.  And the intent to defraud is one common

22 element of wire fraud and securities fraud.

23         I ask you to please keep an open mind throughout the

24 government's presentation.  Listen to the testimony closely.  Look

25 at the exhibits as they're presented.  And, again, at the end of

1   the case, we'll come back, both parties will give you a summation,

2   tell you what we think that the evidence shows.  And I'll ask you

3   find Mr. Felton not guilty on all those charges.  Thank you.

4           THE COURT:  Mr. Kitchens or Ms. Sneed, if you would like

5   to call your first witness, please.

6           MR. KITCHENS:  Yes, your Honor.  The government calls

7   Special Agent Joseph Stites.

8           COURTROOM DEPUTY CLERK:  Mr. Stites, remain standing and

9   raise your right hand.

10              _____

11                      JOSEPH STITES

12           a witness herein, being first duly sworn,

13             was examined and testified as follows:

14              _____

15           THE COURT:  Good afternoon, sir.

16           POTENTIAL JUROR:  Good afternoon.

17                    DIRECT EXAMINATION

18   BY MR. KITCHENS:

19   **Q.**  Good afternoon, Agent Stites.  Would you please tell us where

20   you work?

21   **A.**  Federal Bureau of Investigation.

22   **Q.**  What is your title?

23   **A.**  A special agent.

24   **Q.**  What office of the FBI do you work?

25   **A.**  I'm currently working out of headquarters unit that's located

1    in Atlanta.  But during this investigation I worked out of the

2    Atlanta field office.

3    **Q.**  What was the squad that you worked with at the Atlanta field

4    office at the time of this investigation?

5    **A.**  The squad that I was working on is the complex financial

6    crimes squad.

7    **Q.**  What were the types of investigations you did with that squad?

8    **A.**  Primarily bank frauds, investment fraud, corporate and

9    securities fraud investigations.

10   **Q.**  How long have you been with the FBI?

11   **A.**  Just about 18 years.

12   **Q.**  And how long were you with that complex fraud squad?

13   **A.**  About 16-and-a-half years.

14   **Q.**  As part of your work with that squad, did you become aware of

15   Ryan Felton?

16   **A.**  Yes, I did.

17   **Q.**  How did you become aware of him?

18   **A.**  Our squad, we received a referral from the United States

19   Attorney's Office regarding a cryptocurrency investment fraud

20   scheme.  And Mr. Felton was part of that referral.

21   **Q.**  What was your specific role on that investigation?

22   **A.**  I was the case agent on the investigation.

23   **Q.**  As part of that investigation and your role as the case agent

24   for the investigation, can you tell us, did you obtain any

25   documents?

1  **A.**   Yes.

2  **Q.**   What were the types of documents that you obtained as part of

3  your investigation?

4  **A.**   We subpoenaed records from banks, from cryptocurrency

5  exchanges, from retail stores, things like jewelry stores, from

6  car dealerships and also from some real estate investment closing

7  firms.

8  **Q.**   I'll break each of those up a little bit.  You mentioned one

9  of those groups that you obtained records from were cryptocurrency

10  exchanges?

11  **A.**   Yes.

12  **Q.**   What is a cryptocurrency exchange?

13  **A.**   A cryptocurrency exchange is a trading platform similar to

14  what a brokerage platform would be for trading stock.

15  Cryptocurrency exchange is a place where an individual can go out,

16  set up an account, link a regular bank account to it and be able

17  to transfer their US dollars or any currency up to that exchange

18  so that they can purchase cryptocurrency and trade cryptocurrency.

19  **Q.**   I'm going to show you what's been marked for identification as

20  Government Exhibit 1.

21          MR. KITCHENS:  Your Honor, may I approach?

22          THE COURT:  Sure.  And everybody can feel free to move

23  about the courtroom as they'd like for this trial.

24          MR. KITCHENS:  Thank you, your Honor.

25  BY MR. KITCHENS:

1    **Q.**   Agent Stites, do you recognize this exhibit?

2    **A.**   Yes, I do.

3    **Q.**   What is it?

4    **A.**   This is the subpoena response that we received from Bittrix,

5    which is a cryptocurrency exchange.

6            MR. KITCHENS:  The government offers Government

7    Exhibit 1.

8            MR. LOWTHER:  No objection, your Honor.

9            THE COURT:  It's admitted.

10           MR. KITCHENS:  Ms. Etienne, can we pull this record up,

11   Government Exhibit 1.  Thank you.

12           It's a little blurry.  Is there a way to just focus on

13   the text a little bit.

14   BY MR. KITCHENS:

15   **Q.**   What is this record that we are looking at on the first page?

16   **A.**   The very first page is the business record certification form.

17   **Q.**   What is a business record certification?

18   **A.**   It basically -- whenever we subpoena records from a business,

19   or in this case this cryptocurrency exchange, the individual

20   responsible for providing the response will complete this business

21   record certification form to certify that the records they're

22   responding to in the subpoena are their certified business

23   records.

24       And in this case, the chief compliance officer of Bittrix,

25   John Roth, responded with the business record certification.

**Q.** And were there business record certifications that were
prepared by custodians for each of the records we're going to talk
about this afternoon?

**A.** Yes.

**Q.** Just in general, what were the types of records that Bittrex
provided to you in your investigation?

**A.** Initially you get the account opening documents.  So very
similar if you were to open up a bank account, they want --
Bittrex would have required identification documents, your
identifiers, your dates of birth, social, address, phone, e-mail,
driver's license, a photo of yourself.  But all the stuff that
they can verify that they're actually dealing with an individual,
and they can do some checks to make sure that the individual is
legit.

            MR. KITCHENS:  Ms. Etienne, can we pull up page three of
this document.

**Q.** Agent Stites, what was this in Bittrex's records?

**A.** This is a photograph of the account owner, which is
Mr. Felton, that Mr. Felton would have provided to Bittrex as
part of the account opening.

**Q.** Do the cryptocurrency exchanges request information like this
as part of their know-your-customer obligations?

**A.** That's correct.

**Q.** If we look at page five of this document, what was this?

**A.** This is a Georgia driver's license for Mr. Felton that was

1  submitted to Bittrex as part of the account opening.

2  **Q.**  Would this have been information provided by the

3  accountholder?

4  **A.**  Yes.

5  **Q.**  And if we just look at the next page of Exhibit 1.

6         MR. KITCHENS:  That's page six.  Thank you, Ms. Etienne.

7  If we just look at kind of the top half of this document.  That's

8  perfect.

9  **Q.**  What was the e-mail address associated with this Bittrex

10 account?

11 **A.**  The e-mail was ryan@avaatlanta.com.

12 **Q.**  And what was the date that the Bittrex account for Mr. Felton

13 was created?

14 **A.**  The account was created on August 17th, 2017.

15        MR. KITCHENS:  Lastly, Ms. Etienne, would you please

16 show us page 17 of Exhibit 1.  Thank you.

17 **Q.**  Agent Stites, what was in the back part of the Bittrex

18 records?

19 **A.**  This was a file that Bittrex provided, which is really like a

20 transaction history.  It's a comma-delimited file showing

21 deposits, withdrawals, the current balances, an order history

22 and -- as well as IP information for the account.  So sort of a

23 complete listing of all the transactions and the activity in the

24 account for Mr. Felton.

25 **Q.**  And were these generally cryptocurrency transactions within

1  the Bittrex account?

2  **A.**  Correct.

3        MR. KITCHENS:  We can take this down.

4  **Q.**  Did you also obtain records from another cryptocurrency

5  exchange as part of your investigation?

6  **A.**  I did.

7  **Q.**  I'm going to show you what's been marked as Government

8  Exhibit 3 and Government Exhibit 4.

9     Do you recognize what those documents are?

10 **A.**  I do.

11 **Q.**  What are they?

12 **A.**  Exhibit 3 to start is the business records we received

13 pursuant to the subpoena to Gemini Trust Company, LLC, which is

14 another cryptocurrency exchange.

15 **Q.**  What about Exhibit 4?

16 **A.**  Exhibit 4, this is a listing of all of the transaction detail

17 that was associated with the Bittrex -- or the Gemini account.

18        MR. KITCHENS:  We offer for admission Government

19 Exhibit 3 and 4.

20        MR. LOWTHER:  No objection.

21        THE COURT:  They're admitted.

22        MR. KITCHENS:  If we can bring up Exhibit 3 first

23 please, Ms. Etienne.

24 BY MR. KITCHENS:

25 **Q.**  And this, again, is this another business record

1   certification?

2   **A.**   Yes.

3   **Q.**   What types of documents were produced by Gemini?

4   **A.**   Same sort of documents.   The account opening documentation,

5   which is all the know-your-customer information, the photographs,

6   the driver's license, all the identifiers, e-mails, telephones.

7            MR. KITCHENS:   Can we please go to page 2 of Exhibit 3.

8   If we blow up just the very top.   That's a little better.   Is

9   there a way to focus maybe -- I know the type is so small.   Is

10  there a way to focus just kind of on that first section,

11  Ms. Etienne?   Great.   Okay.

12  BY MR. KITCHENS:

13  **Q.**   What was the account name?

14  **A.**   The account name was ryan@avaatlanta.com's account.

15  **Q.**   Is that that same e-mail address that we saw associated with

16  the Bittrex account?

17  **A.**   Yes.

18           MR. KITCHENS:   And then, Ms. Etienne, if we look at the

19  top but kind of on the right side of the screen, if we can bring

20  that up.   Perfect.

21  **Q.**   What was the full name associated with the account?

22  **A.**   Ryan Felton.

23  **Q.**   And what was the sign-up date?

24  **A.**   July 11th, 2017.

25           MR. KITCHENS:   Okay.   We can take this down,

1  Ms. Etienne.

2          Let's look at page 8 of Exhibit 3.  If we can blow that

3  part up.  Okay.  Perfect.

4  **Q.**  What information was provided by Gemini for this particular

5  account?

6  **A.**  This is the bank account that would be linked to this exchange

7  account.  So this is the Wells Fargo -- showing a Wells Fargo

8  account in the name of Ryan Felton.  The last digits are 3037 on

9  the account.  But this is an account that you could transfer money

10  from your Wells Fargo account up to the currency exchange and use

11  it for trading, or when if you want to cash out your

12  cryptocurrency, you can withdraw and deposit back into this

13  account.  So they allow you to set up these accounts and link them

14  to the exchange.

15          MR. KITCHENS:  Ms. Etienne, can we look at page 9 of

16  Exhibit 3.  Just at the bottom, if we can blow that up, please.

17  **Q.**  And is that, again, the driver's license provided by the

18  accountholder?

19  **A.**  Yes.

20          MR. KITCHENS:  We can take that down.  I'm going to look

21  at Exhibit 4.  I know it's a little unwieldy.

22          Ms. Oduka, can we try to use the Elmo?

23  **Q.**  I'm obviously not going to show you the whole thing.

24      When we're looking at Exhibit 4, what type of information was

25  provided by Gemini?

**A.**  This is the complete transaction history on this account at --
on Mr. Felton's account at Gemini.  And it's going to show
deposits, the transfers from like the Wells Fargo account into the
Gemini account, the purchases of different cryptocurrency, the
buys and the sales.  And showing kind of what the amount is, the
conversion, the balance in the account, the trading fees.  Yeah.
And just kind of showing the different balances of the different
types of cryptocurrencies that are purchased.

**Q.**  So did it show for any given time the amount of Bitcoin, the
amount of ether in the account?

**A.**  Yes.

**Q.**  Did it also provide the dates of these transactions?

**A.**  Yes, it did.  Dates and times.

**Q.**  And for certain transactions, did it show transaction hashes?

**A.**  Yes.

**Q.**  And then also did it show the numbers for a withdrawal
destination?

**A.**  Yes.

**Q.**  And is that a cryptocurrency address?

**A.**  Yes.

           MR. KITCHENS:  Thank you, Ms. Oduka.

**Q.**  You also mentioned in addition to cryptocurrency exchange
records you also obtained records from banks?

**A.**  Yes.

**Q.**  And whose financial records did you obtain?

1  **A.**  Mr. Felton's.

2  **Q.**  I'm going to show you what's been marked as Government's

3  Exhibit 5 and Exhibits 5-A through 5-J.

4      Okay.  First I'm going to start with the disk that I gave you.

5  Do you recognize that disk?

6  **A.**  I do.

7  **Q.**  What is contained on that disk?

8  **A.**  This contains the full response from Wells Fargo for the

9  business records they provided pursuant to a subpoena.

10  **Q.**  And how do you know that those records are on that disc?

11  **A.**  I verified that the records that we received from the subpoena

12  were the same records that were put onto this disc.

13  **Q.**  After you verified it, what did you do to indicate that it

14  contained those records?

15  **A.**  I initialed it right there.  And then I put the date, which

16  was today's date, 7/11 of 22 on the -- to certify that these are

17  the records that I reviewed.

18  **Q.**  And the paper documents, switching briefly to that.  What are

19  those paper documents labeled as Exhibits 5-A through 5-J?

20  **A.**  These are excerpts from what was on this disc.  So these same

21  records appear on the disc, but these are just excerpts of them,

22  specific documents that are labeled with different exhibit

23  numbers.

24          MR. KITCHENS:  We offer for admission Exhibit 5 and

25  Exhibits 5-A through 5-J.

1          MR. LOWTHER:  No objection.

2          THE COURT:  They're admitted.

3   BY MR. KITCHENS:

4   **Q.**  Based on your review of these Wells Fargo records, who was the

5   accountholder at issue for the account that you obtained?

6   **A.**  A Ryan Felton.

7   **Q.**  Let's look at one of those excerpts, one of the paper

8   documents you have.

9          MR. KITCHENS:  Ms. Etienne, can we bring up Exhibit 5-A.

10  **Q.**  And who was the customer listed for this particular account?

11  **A.**  The customer is Ryan Felton.

12         MR. KITCHENS:  And if we go to -- can we please go to

13  the second page of this document, Ms. Etienne.  All right.

14  **Q.**  Did that provide his personal information and signature?

15  **A.**  Yes.

16  **Q.**  What was the account number --

17         MR. KITCHENS:  We can take this down.

18  **Q.**  What was the account number for this particular account?

19  **A.**  The account number is 295775 --

20  **Q.**  I should say, I'm sorry, Agent Stites, just the four last

21  digits?

22  **A.**  Last four are 3037.

23  **Q.**  Is that that same Wells Fargo account we saw that was linked

24  to the Gemini account?

25  **A.**  Yes, it is.

1  **Q.**  What types of bank records were provided by Wells Fargo in

2  your investigation?

3  **A.**  Bank records include the account opening documentation,

4  signature cards, bank statements, deposit slips, checks,

5  withdrawal tickets, wire information, all the transactional

6  information that occurred in the account for the time period that

7  we specified in the subpoena we received.

8  **Q.**  And after you received those bank records, did you look at

9  some of the purchases made by Mr. Felton during this time period?

10  **A.**  Yes.

11  **Q.**  And what were some of those purchases that you saw?

12  **A.**  We saw the Ferrari.  A residence, purchasing a house,

13  purchasing a Chevy Tahoe.  And then some jewelry purchases.

14  **Q.**  Did you obtain records regarding those purchases?

15  **A.**  Yes.

16  **Q.**  Let's talk specifically about that, the Chevy Tahoe you

17  mentioned.  What records did you obtain for that?

18  **A.**  We subpoenaed the dealership where the Chevy Tahoe was

19  purchased.  And we received all the purchasing documents that --

20  all the different forms and -- that you would fill out when you

21  purchase a vehicle.  We received all of those documents related to

22  Mr. Felton's purchase of the Tahoe.

23  **Q.**  I'm going to show you what's been marked as Government

24  Exhibit 2.

25      Do you recognize what that is?

1  **A.**   Yes.

2  **Q.**   What is it?

3  **A.**   This is the subpoena response that we received from Carl Black

4  Chevrolet Buick GMC, Inc.  These is the documents we received

5  pursuant to the subpoena we served.  And the first page is the

6  business record certification from the compliance officer there

7  who responded to the subpoena.

8          MR. KITCHENS:  We offer for admission Government

9  Exhibit 2.

10          MR. LOWTHER:  No objection, your Honor.

11          THE COURT:  Admitted.

12          MR. KITCHENS:  All right.  Ms. Etienne, thank you.

13          Let's look at -- can we please bring up page 13 of

14  Exhibit 2.

15  **Q.**   What was this document provided by Carl Black Chevrolet.

16  **A.**   I'll just move into the document so I can see a little

17  clearer.

18      This is the retail purchase agreement between the dealership

19  and Mr. Felton.

20  **Q.**   Looking at the top, who was the purchaser?

21  **A.**   Purchaser is Ryan Felton.

22  **Q.**   What was the home address listed?

23  **A.**   75 Abington Court, Atlanta, Georgia 30327.

24  **Q.**   Looking towards the right side at the top, what was the date

25  of the purchase for this vehicle?

1   **A.**   It was 10/31 of 2017.

2   **Q.**   Now let's look a little bit of this chart down below.   What

3   was the car that was purchased?

4   **A.**   The vehicle was a 2017 Chevy Tahoe.   It black in color.   And

5   it had 250 miles on it, so it was brand new.

6   **Q.**   A new vehicle?

7   **A.**   Brand new, yes.

8   **Q.**   And then on the right side -- I'm not going to make you go

9   line by line, but what is being calculated on the right side of

10   this chart?

11   **A.**   MSRP, plus or minus, you know, fees and costs and taxes.   And

12   ultimately the total price was $58,250.

13          MR. KITCHENS:   Can we please bring up page three of this

14   document.

15   **Q.**   What are we looking at on page three?

16   **A.**   This is a cashier's check payable to Carl Black Kennesaw.   And

17   the -- this is a Wells Fargo check that was an official check to

18   Carl Black Kennesaw.   And it was the check that was presented to

19   the dealership to pay for the vehicle.

20   **Q.**   And the date of it?

21   **A.**   October 31st, 2017.

22   **Q.**   And the amount of the check, the 58,250, was that the total

23   amount due for that car?

24   **A.**   Yes.   That was on the retail agreement that we just looked at,

25   same amount.

1  **Q.**  So was this car paid entirely with cash?

2  **A.**  Yes.

3           MR. KITCHENS:  No further questions at this time, your

4  Honor.

5           THE COURT:  Any cross?

6           MR. LOWTHER:  No questions, your Honor.

7           THE COURT:  Sir, you can step down.

8           (Witness excused)

9           THE COURT:  How long do you anticipate your next witness

10 will last?

11          MR. KITCHENS:  Excuse me, your Honor?

12          THE COURT:  How long will your next witness be?

13          MR. KITCHENS:  Maybe about half an hour, your Honor, or

14 so.

15          THE COURT:  Okay.  We're going to take another short

16 break before this next witness.  I think we've been going about an

17 hour and a half or so, maybe a little longer.

18          You're reminded of all of your instructions for breaks.

19 But the real core of those instructions are to please not talk

20 with anyone, including yourselves, about this case in any way.

21 And not to do any research about this case in any way.

22          Our court security officer will escort you to the jury

23 room.  And if we can all just be ready to go in about ten minutes,

24 please.  Thank you.

25          (The jury exited the courtroom)

```
1              THE COURT:  Y'all can have your seats.  Thank you.
2              Counsel, anything we need to discuss before the next
3  witness?
4              MR. LOWTHER:  No, your Honor.
5              MR. KITCHENS:  I don't think so at this time.  I
6  think --
7              THE COURT:  See y'all in ten minutes.
8              (After a recess, the proceedings continued as follows:)
9                         (Court Announced)
10             THE COURT:  Folks, are we ready to bring out the jury?
11             MR. KITCHENS:  Just to give your Honor just a little
12 view of the schedule, we have, we think, two more witnesses that
13 we have prepared to testify today.  So, again, I think the first
14 witness will probably be half an hour or so.  The second witness
15 will be a little bit longer than that.
16             THE COURT:  Who are the two witnesses?
17             MR. KITCHENS:  It is Russell Castillo and Carlos
18 Martinez.  So they will be the two witnesses.
19             One other just update on that.  We have spoken with --
20 I've been trying to, again, figure out travel plans with one of
21 the other international witnesses.  He also -- starting for the
22 weekend, we've been trying to figure out work-arounds.  It seems
23 he is likely to be unavailable to travel until -- you know, not in
24 enough time to be here before the completion of the trial as we're
25 currently scheduled.  So, again, that would be the witness with
```

1  the initials DB.  So we anticipate, barring some very sudden

2  change, that we would --

3          THE COURT:  Is that the first or second witness with the

4  DB initials I have on my list?

5          MR. KITCHENS:  David Brown.  So it's DB.  And it's the

6  one that's listed in Counts 4, 5 and 12.  So we anticipate that --

7  just like we did with the witness with the initials BP, we

8  anticipate we'll be dismissing those relevant counts as well.

9  We've discussed it with the defense.

10         We, obviously, will let you know if anything unexpected

11 happens.  That's all to say, again, I think we're moving well

12 ahead of schedule I think at this point, given how things are

13 shaping up.

14         THE COURT:  Okay.  Very well.  Thank you for the update.

15         Please bring out the jury.  Thank you.

16         (The jury entered the courtroom)

17         THE COURT:  Y'all can have your seats.

18         Basically when everybody is standing up in here, it's

19 actually for you.  So you can just come on in and sit down

20 whenever you're marching in and out.

21         (Off-the-record discussion)

22         THE COURT:  If the United States wants to call its next

23 witness.

24         MS. SNEED:  Yes, your Honor.  The government calls

25 Russell Castillo.

1          COURTROOM DEPUTY CLERK:  Mr. Castillo, if you will raise

2    your right hand.

3                    _____

4                           RUSSELL CASTILLO

5             a witness herein, being first duly sworn,

6                was examined and testified as follows:

7                    _____

8          COURTROOM DEPUTY CLERK:  Thank you.  You can be seated.

9                         DIRECT EXAMINATION

10   BY MS. SNEED:

11   **Q.**  Please state and spell your name, sir.

12   **A.**  Russell Castillo.

13   **Q.**  Spell the last name, please.

14   **A.**  C-A-S-T-I-L-L-O.

15   **Q.**  Are you currently employed as a federal contractor?

16   **A.**  Yes.

17   **Q.**  What is your title?

18   **A.**  Data analyst.

19   **Q.**  Do you have any other duties?

20   **A.**  A web capture analyst.  I'm the head of the web capture team.

21   **Q.**  Can you explain to the jury what that means, a web capture

22   team?

23   **A.**  I capture websites, video, audio and various social media

24   platform data that's on the Internet.

25   **Q.**  And by capture, what do you mean?

**A.**  Either I take an HTML capture of a full website or take
screenshots or images of particular parts of a website.

**Q.**  How long have you been doing that?

**A.**  Nine-and-a-half years.

**Q.**  And could you please describe for the jury the process by
which you and your team capture websites?

**A.**  When capturing websites, we work on a ticketing system.  On my
agency's database we assign the ticket and begin processing them.
The requests come in from point of contact.  And then we complete
the request, send it back to them.

**Q.**  And usually what sort of information is on the ticket as far
as web capturing?

**A.**  The website URLs, any information in terms of what needs to be
captured for casework.

**Q.**  And website URL means what exactly?  Is it the website
address?

**A.**  Yes.  The website address that you would put in the search
bar.

**Q.**  Do you use a specific computer to perform these duties?

**A.**  Yes.  When capturing data, we -- doing website captures we do
it on something called the unanimous browser.  It's a computer
that doesn't track it back to basically our agency, so it's
anonymous.

**Q.**  And do you use particular tools in order to do this, or
program?

**A.**   Yes.  We use various tools depending on the requests.

**Q.**   And do the tools depend on the particular website that you may be trying to capture?

**A.**   Yes.

**Q.**   And once you have completed the ticket, what do you do?

**A.**   After completing the ticket, I complete a declaration and send it back to the requester.

**Q.**   And what sort of information does the declaration usually contain?

**A.**   The declaration will have the website URLs, the investigation number, the analyst that completed it, the date it was captured and the tools that were used.

**Q.**   Were you asked to conduct web captures and video captures as part of investigation NY-Z9959?

**A.**   Yes.

**Q.**   I'm going to show you some documents now, Mr. Castillo.

I placed before you what's been marked as Government Exhibits 6, 7, 8, 9, 10, 12, 13, 15, 18, 20 and 62.  Do you recognize those documents, sir?

**A.**   Yes.

**Q.**   And, in general, what are those documents?

**A.**   Various requests that I was given to have to capture, whether it be from the Wayback Machine, looks like ryanfelton.com. Wayback Machine, ryanfelton.com and -- yep, that's it from what I see.

1  **Q.**  What is the date range for those web captures?

2  **A.**  Date range?  November 18 to -- November 18 to 21st, 2018.

3  **Q.**  You said November 2018 to what was that --

4  **A.**  No.  November 18 to 21st, 2018.

5  **Q.**  Got it.  Thank you, sir.

6          MS. SNEED:  Your Honor, I move to admit Exhibits 6, 7,

7  8, 9, 10, 12, 13, 15, 18, 20 and 62.

8          MR. LOWTHER:  No objection.

9          THE COURT:  They're admitted.

10         MS. SNEED:  Ms. Oduka, if I could have the Elmo, please.

11 Thank you.

12 BY MS. SNEED:

13 **Q.**  Mr. Castillo, you mentioned the word Wayback Machine.  What is

14 that?

15 **A.**  It's an Internet archive that's publicly available on the

16 Internet.  It's basically screenshots of how websites look at a

17 particular date and time.

18         MS. SNEED:  And I will put on the screen for the jury to

19 see as an example Exhibit 6.

20 **Q.**  Sir, what is that black box with yellow letters and numbers at

21 the top of page 3 of Exhibit 6?

22 **A.**  It's the date the screenshots were taken on the Wayback

23 Machine.

24 **Q.**  And when you say the date the screenshots were taken on the

25 Wayback Machine, what do you mean by that?

**A.**   This is how the website would have looked on August 22nd,
2017.

**Q.**   And so when you went in to take your own screenshot, what were
the steps that you took in order to use the Wayback Machine?

**A.**   Looks like I just took a screenshot, pasted it into Adobe
Acrobat.

**Q.**   So is there a particular website that you go to in order to
use the Wayback Machine?

**A.**   You just go to archive.org, type -- in this case you would
have typed the FLiK.io.  And then these are probably the dates I
was given to capture in particular.  And all these dates would
have been listed.

**Q.**   So at the top, where are you seeing the website address for
this -- for Exhibit 6?

**A.**   Right on the search bar, next to where it says "Wayback
Machine," to the right.  That's the website.

**Q.**   And when you take a web capture of a particular website, do
you take a capture of the entire website or just portions or how
does that work?

**A.**   It depends on what they put on the ticket, if it's just a
single page capture or the full website.  It depends.

**Q.**   Can you tell from Exhibit 6 what type of capture it was?

**A.**   Looks like it might be a -- appears it's a full capture since
it's the homepage of the website.  If it was a single capture,
there would be some more information or more letters, backslash to

1  the right of www.theflik.io.  You can tell that would be a single

2  page capture, but this appears to be the full website.

3  **Q.**  So turning to page 4 of Exhibit 6 -- and it's on the screen in

4  front of you, too, sir.

5  **A.**  Okay.

6  **Q.**  So is that another part of the FLiK.io website?

7  **A.**  Yes.

8  **Q.**  Still on page four of Exhibit 6, see to the right there there

9  looks to be a scroll-down bar?

10  **A.**  Yes.

11  **Q.**  What does that mean?  Are you scrolling down and taking a

12  shot, or how does that work using the Wayback Machine?

13  **A.**  I believe for this capture I have to physically scroll down

14  and take the screenshots for each segment of the page.

15  **Q.**  And that's why we see the scroll bar to the right?

16  **A.**  Yep.

17  **Q.**  Just to show the jury another example of the Wayback Machine

18  screenshots, I'll turn to Exhibit 7, page 3.  And what is the web

19  address for Exhibit 7 that you took a screen capture of?

20  **A.**  It is the FLiK.io whitepaper.

21  **Q.**  And what does the fact that whitepaper is now added to the

22  FLiK.io address mean for those who may not know?

23  **A.**  It's just a single-page capture of that particular web page

24  within the FLiK.io.

25  **Q.**  And what is the date at the top in that black box?

**A.**   It is September 3rd, 2017.

**Q.**   So when you're using the Wayback Machine, do you have to insert what date you want to take a screen capture of of a particular website?

**A.**   No, you do not.  You could actually -- for each web page there's a certain amount of captures.  Like on this one you can see it says 17 different versions right under the bar, like over here.

          MS. SNEED:  In the upper right side of page 3, I believe, of Exhibit 7 for the record.

**Q.**   Why do you choose which screen capture of those 17 to take?

**A.**   The requester asks for a particular date.  Sometimes they might ask for all of them.

**Q.**   All of the potential captures in the Wayback Machine for a specific website, is that right?

**A.**   Yes.

**Q.**   And looking at page 4 of Exhibit 7, what does that dark screen with just the little symbol for the play button mean?

**A.**   It means that there's a video on that page.

**Q.**   So when you use the Wayback Machine, are you able to also capture the video?

**A.**   Sometimes videos don't work on the Wayback Machine.

**Q.**   And what sort of tool did you use to actually take this web capture?

**A.**   Just Adobe Acrobat.

1  **Q.**  Does Adobe Acrobat give you the ability to look at video?

2  **A.**  No.

3  **Q.**  Sir, I'm going to show you another group of documents.  I have

4  placed before you what's been marked as Government Exhibits 11,

5  14, 16, 27 and 31.  Do you recognize these documents?

6  **A.**  Yes.

7  **Q.**  What are they?

8  **A.**  They appear to be Twitter captures, I believe, all of them.

9  Yes, Twitter captures.

10  **Q.**  And those are captures of the website, Twitter, that you did?

11  **A.**  Yes.  The social media platform, Twitter.

12          MS. SNEED:  And, your Honor, I would move to admit

13  Exhibits 11, 14, 16, 27 and 31.

14          MR. LOWTHER:  No objection.

15          THE COURT:  They're admitted.

16  BY MS. SNEED:

17  **Q.**  And just to show the jury an example of what this looks like,

18  I've placed on the screen before you page 2 of Exhibit 11.  What

19  is that showing us?

20  **A.**  This is a Tweet from the music artist TI.  This is his Twitter

21  account.

22          THE COURT:  Ms. Sneed, let me interrupt you for a

23  moment.  I want to make sure I got that last -- you said 11, 14,

24  16, 27 and what was the last one?

25          MS. SNEED:  31, your Honor.

1           THE COURT:  Thank you.

2 BY MS. SNEED:

3 **Q.**  And, Mr. Castillo, did you use the Wayback Machine to take a

4 screenshot of Exhibit 11?

5 **A.**  No.  These were live on Twitter at the time of capture.

6 **Q.**  So in general what were the dates that you took the

7 screenshots of Exhibits 11, 14, 16, 27 and 31?

8 **A.**  For Exhibit 11, it was on October 12th, 2018.  For Exhibit 14,

9 it was November 15th, 2018.  For Exhibit 16, it was November 15,

10 2018.  For Exhibit 27, it was February 28th, 2019.  For

11 Exhibit 31, it was October 12th, 2018.

12 **Q.**  So turning back to Exhibit 11, the date you took the

13 screenshot was on October 12th, 2018, as you testified.  So this

14 is how this Twitter account looked on that exact date, is that

15 right?

16 **A.**  Yes.

17 **Q.**  And can you tell whose Twitter account this is?

18 **A.**  Yes.

19 **Q.**  Whose is it?

20 **A.**  The music artist TI.

21 **Q.**  And what tool did you use?

22 **A.**  I used Adobe Acrobat Pro.

23 **Q.**  And the Adobe Acrobat tool takes just a static picture, no

24 moving parts, correct?

25 **A.**  Yes.

1  **Q.**  Sir, I've placed before you a document marked as Government

2  Exhibit 17.  Do you recognize that document?

3  **A.**  Yes.

4  **Q.**  What is it?

5  **A.**  It's website captures of Instagram, the social media platform,

6  Instagram.

7  **Q.**  That you did?

8  **A.**  Yes.

9  **Q.**  And what date did you do it?

10  **A.**  This was done on March 5th, 2019.

11        MS. SNEED:  Your Honor, I move to admit Government

12  Exhibit 17.

13        MR. LOWTHER:  No objection.

14        THE COURT:  It's admitted.

15  BY MS. SNEED:

16  **Q.**  And what tool did you use to take this web capture?

17  **A.**  Adobe Acrobat Pro and HyperCam 3.

18  **Q.**  What are those tools?  I don't think we've discussed those

19  yet.

20  **A.**  We did for Adobe.  But for HyperCam it's for capturing videos

21  in realtime.

22  **Q.**  And I've placed on the Elmo page 3 of Exhibit 17.  Can you

23  tell whose account that is on Instagram?

24  **A.**  It's Jennifer Felton's Instagram account.

25  **Q.**  And what are those little gray boxes at the top?

**A.**   Are you referring to the ones above the search bar?

**Q.**   Yes.

**A.**   The different -- it's a different URL for each -- so this would have been seven captures basically.  So it's a different web page.

**Q.**   What date did you make the web capture in Exhibit 17?

**A.**   December 26th, 2017.

**Q.**   And just like with Twitter, this is how it looked on the day that you actually took the screenshot?

**A.**   Yes.

**Q.**   I've placed before you what's been marked as Government Exhibit 21.  Do you recognize that document?

**A.**   Yes.

**Q.**   What is it?

**A.**   It is a full website capture of skyblockmediagroup.com.

**Q.**   What date did you take that?

**A.**   This was done on October 12th, 2018.

**Q.**   And what tools did you use?

**A.**   I used Offline Explorer.

**Q.**   What is Offline Explorer?

**A.**   It's a program that captures the website in the HTML format. So you can view the website basically like it's a live website, clicking the links, but it's an archived copy, basically.

          MS. SNEED:  Your Honor, I would move to admit Exhibit 21.

```
 1              MR. LOWTHER:  No objection.

 2              THE COURT:  It's admitted.

 3   BY MS. SNEED:

 4   Q.  To show the jury what that looks like, I've placed on the

 5   screen page 2 of Exhibit 21.  And I believe, Mr. Castillo, you

 6   were saying it's an HTML format or -- how did you explain it?

 7   A.  Yes.

 8   Q.  And so that's why we can't see pictures?

 9   A.  Yes.  This is basically how it would look if you just printed

10   it straight off the website.

11   Q.  And I can't recall if I asked you, but what date did you take

12   this screenshot?

13   A.  October 12th, 2018.

14   Q.  And that's how it looked on that exact date, right?

15   A.  Yes.

16   Q.  I've placed before you now documents that have been marked as

17   Government Exhibits 24, 25, and 26.  Do you recognize these

18   documents?

19   A.  Yes.

20   Q.  And what are they?

21   A.  They are captures of CoinSpark.io, some of the sub-pages

22   within that website, and CoinSpark's Twitter account.  And it

23   looks like one post from Alpha Point Live's Twitter account.

24   Q.  And what date did you make these web captures?

25   A.  February 28th, 2019.
```

1   **Q.**   What tools did you use?

2   **A.**   I used Full Page Screen Capture and Adobe Acrobat Pro.

3          MS. SNEED:   Your Honor, I would move to admit Government

4   Exhibit 24, 25 and 26.

5          MR. LOWTHER:   No objection.

6          THE COURT:   They're admitted.

7   BY MS. SNEED:

8   **Q.**   And I don't think we've discussed Full Page Screen Capture.

9   What does that mean?

10  **A.**   It's an extension that's available on Google Chrome.   It

11  basically just takes a single page capture of a particular

12  website.   You basically have to do this page by page if you're

13  capturing a website.   And it will actually scroll down from top to

14  bottom.

15  **Q.**   So just to show the jury what that looks like, I've placed on

16  the screen -- or I will be placing on the screen page 2 of

17  Exhibit 26.   Is that a full page screen capture?

18  **A.**   Yes.

19  **Q.**   And that -- what website was that from?

20  **A.**   This is for the single page of the Spark token update and burn

21  schedule for CoinSpark.

22  **Q.**   That was on the CoinSpark.io, correct?

23  **A.**   Yes.

24  **Q.**   I've placed before you what's been marked as Government

25  Exhibits 23 and -- I'm sorry, 22 and 23.   Do you recognize those

1  documents?

2  **A.**   Yes.

3  **Q.**   And what are they?

4  **A.**   These were captures on the social media platform, Telegram.

5  **Q.**   How do you make screen captures or web captures on Telegram?

6  **A.**   For Telegram you have to download the actual program.  And you

7  can actually export the whole chat history straight from that

8  application.

9  **Q.**   I'm holding in my hands two discs.  One is marked as

10  Government Exhibit 22.  And one is marked as Government

11  Exhibit 23.  Do you recognize these?

12  **A.**   Yes.

13  **Q.**   And what do these discs -- what are the contents of these

14  discs?

15  **A.**   Just chat histories from these four Telegram accounts.  The

16  FLiK.io, FLiK.io, FLiK Entertainment and CoinSpark.

17  **Q.**   And the contents of Government Exhibit 22 and Government

18  Exhibit 23 were pretty voluminous, is that right?

19  **A.**   Yes.  I believe it was like 400 pages on each PDF, it looked

20  like.

21  **Q.**   And are these your initials on Government Exhibits 22 and 23

22  on the disc?

23  **A.**   Yes.

24  **Q.**   And that indicates that you viewed the contents of each of

25  these discs?

1  **A.**  Yes.

2          MS. SNEED:  Your Honor, I move to admit Government

3  Exhibits 22 and 23.

4          MR. LOWTHER:  No objection.

5          THE COURT:  They're admitted.

6  BY MS. SNEED:

7  **Q.**  And the web captures of Government Exhibits 22 and 23, did

8  they look like how they looked when you did the screen captures?

9  **A.**  Yes.

10  **Q.**  I've placed before you a document marked Government

11  Exhibit 28.  Do you recognize that?

12  **A.**  Yes.

13  **Q.**  What is it?

14  **A.**  It is the capture of an article on medium.com by the user

15  taylormike498.

16  **Q.**  And you made that web capture?

17  **A.**  Yes.

18  **Q.**  On what date?

19  **A.**  April 10th, 2019.

20  **Q.**  And what tools did you use?

21  **A.**  I used Adobe Acrobat and Google Chrome.

22          MS. SNEED:  Your Honor, I move to admit Exhibit 28.

23          MR. LOWTHER:  No objection.

24          THE COURT:  It's admitted.

25  BY MS. SNEED:

1  **Q.**  And just to show the jury what this looks like, that website

2  at the bottom there, did you type that, or how did that get on the

3  page?

4  **A.**  I think I added Google Chrome to the list of tools because

5  pretty much this was just print to PDF.  And when you do that, the

6  URL sticks to the bottom pretty much for those kind of captures

7  along with the header on the top.

8  **Q.**  And does Exhibit 28, it looked like that on the date that you

9  captured it?

10  **A.**  Yes.

11  **Q.**  Lastly I've placed before you what has been marked as

12  Government Exhibits 29 and 30.  Do you recognize those documents?

13  **A.**  Yes.

14  **Q.**  What are they?

15  **A.**  For Exhibit 29, it's -- it's "How to Raise Money for Your Film

16  Legally" web page from the ryanfelton.com.

17  **Q.**  And Exhibit 30?

18  **A.**  And this is cleaning the air page from the ryanfelton.com as

19  well.

20  **Q.**  I'm sorry?

21  **A.**  One second.  Okay.  "Clearing the Air" web page from the

22  ryanfelton.com.

23  **Q.**  What dates did you make those web captures?

24  **A.**  October 5th, 2018, and November 19th, 2018.

25          MS. SNEED:  And the government would move to admit

1  Exhibits 29 and 30.

2          MR. LOWTHER:  No objection.

3          THE COURT:  They're admitted.

4          MS. SNEED:  Your Honor, can I have a brief moment?

5          THE COURT:  Sure.

6          (Pause in the proceedings)

7          MS. SNEED:  Thank you for that brief delay, your Honor.

8          Those are all the questions I have for you, Mr.

9  Castillo.

10          THE WITNESS:  Thank you.

11          THE COURT:  Any cross?

12          MR. LOWTHER:  No, your Honor.

13          THE COURT:  Sir, you can step down.  Thank you.

14          (Witness excused)

15          THE COURT:  Please call your next witness.

16          MS. SNEED:  Your Honor, the government calls Carlos

17  Martinez.

18          THE COURT:  Good afternoon.

19          COURTROOM DEPUTY CLERK:  Hello, Mr. Martinez.  If you'll

20  remain standing and raise your right hand.

21          _____

22                    CARLOS MARTINEZ

23          a witness herein, being first duly sworn,

24            was examined and testified as follows:

25          _____

1          COURTROOM DEPUTY CLERK: Thank you.  You can be seated.

2                         DIRECT EXAMINATION

3     BY MS. SNEED:

4     **Q.**  Good afternoon, Mr. Martinez.  How are you today, sir?

5     **A.**  I'm doing okay.  Thank you.

6     **Q.**  Where do you live?

7     **A.**  I live in Cumming, Georgia.

8     **Q.**  Do you have a college degree?

9     **A.**  Yes.

10    **Q.**  What is your degree in?

11    **A.**  It's a Bachelor of Science degree in business with a computer

12    technology systems concentration.

13    **Q.**  What year did you graduate?

14    **A.**  2011.

15    **Q.**  You are self-employed, correct?

16    **A.**  Correct.

17    **Q.**  What do you do?

18    **A.**  I do cryptocurrency trading.

19    **Q.**  And in general what does that mean, cryptocurrency trading?

20    **A.**  Basically it's sort of like trading the stockmarket, but I

21    deal with the cryptocurrencies instead of stocks.

22    **Q.**  How many trades do you average a day?

23    **A.**  The -- less than one.  I don't make trades every single day.

24    **Q.**  Do you focus on any particular type of cryptocurrency?

25    **A.**  I focus on several different types.

1  **Q.**  How do you choose what cryptocurrency to buy?

2  **A.**  I track their price action.  And I -- I read up about the --

3  each one that interests me to see if they have a -- a good team

4  and a good active community and good roadmap.  Yes.

5  **Q.**  So you research the cryptocurrencies before you invest in

6  them, correct?

7  **A.**  Yes.  To the best of my ability, I do.

8  **Q.**  How long have you been trading cryptocurrency?

9  **A.**  A little over five years.

10  **Q.**  How did you first become interested in cryptocurrency?

11  **A.**  Well, I've been following the major cryptocurrencies, such as

12  Bitcoin and Litecoin and Dogecoin since the mid twenty-teens.  But

13  it wasn't until 2017 that I really got interested because I saw a

14  lot of them were going up in value, and I figured, why not try to

15  get in and make some money?

16  **Q.**  And have you heard of a FLiK token?

17  **A.**  Yes.

18  **Q.**  Did you at some point buy FLiK tokens?

19  **A.**  Yes.

20  **Q.**  What were FLiK tokens?

21  **A.**  FLiK tokens were supposed to be a utility token for a media

22  platform.

23  **Q.**  What period of time did you buy FLiK tokens?

24  **A.**  Between October 2017 and January 2018.

25  **Q.**  And we'll discuss your specific transactions in a bit, but

1  first I want to learn how you heard about FLiK.

2     So how did you first learn about FLiK tokens?

3  **A.** Well, at the time I -- I was browsing this website called

4  4Chan.  Now, I don't take any serious advice from that site, but I

5  like to read their business section from time to time and see

6  what's trending on there.  And anything that jumps out at me, I

7  then do further research on.  I happened to see a couple of hype

8  posts regarding FLiK.  And from there I sought out more

9  information.

10  **Q.** When was this?

11  **A.** This was October 2017.

12  **Q.** And did you eventually review a website related to FLiK?

13  **A.** Yes.

14        MS. SNEED:  Ms. Etienne, if you could put on the screen

15  Government Exhibit 6, which has been previously admitted into

16  evidence.  Scroll down, please, to the second page.

17  **Q.** Mr. Martinez, Exhibit 6 is on the screen before you.

18        MS. SNEED:  And if we could scroll up to -- or at least

19  page -- there we go, Ms. Etienne.  Thank you.  And if you could

20  cull out the middle of the page there for me.  Yes.  Thank you.  I

21  guess, actually, if you could cull out the web address,

22  Ms. Etienne.  Sorry about that.  Thank you.

23  **Q.** Mr. Martinez, is this the address that you went to to look at

24  the FLiK website?

25  **A.** That is an archived version of the website, but, yes, it is

1  the site I visited.

2  **Q.**  If we just scroll down through Exhibit 6, I just want you to

3  let me know if that's how the website looked about the time you

4  saw it?

5  **A.**  It looked a lot better than this because this is an archived

6  version that does not fully preserve the graphics and appearance

7  and formatting.  But, yes, the text and the important stuff is all

8  there.

9          MS. SNEED:  If we could stay right there.  Or, actually,

10 go up one page please, Ms. Etienne.  Right there.  Thank you.

11 **Q.**  Sir, directing your attention to page four of Exhibit 6, do

12 you see that picture of an individual there?

13         MS. SNEED:  And, Ms. Etienne, if you could cull that

14 out.  Yeah.  There we go.  Thank you.

15 **Q.**  It says page 4 of Exhibit 6, FLiK was founded by Ryan Felton.

16 Had you heard of Ryan Felton before you discovered FLiK?

17 **A.**  No, I hadn't.

18 **Q.**  And did you read his bio on the FLiK website at the time that

19 you were looking at it?

20 **A.**  Yes, I did.

21 **Q.**  And what did you think about his bio, his background, as the

22 founder of this FLiK project?

23 **A.**  Well, at the time I liked what I read.  He sounded like a cool

24 guy.

25 **Q.**  What do you mean you liked what you read?

**A.**   Well, if he's wanting to start up a media platform, I thought

it was good that he -- that he already has experience in film and

film production and...

         MS. SNEED:   Ms. Etienne, if we could go to page five of

Exhibit 6.

**Q.**   Mr. Martinez, do you see on the screen the picture where --

it's labeled TI owner?

**A.**   Yes.

**Q.**   Had you heard of TI at the time you were reviewing the FLiK

website?

**A.**   Yes.

**Q.**   And was it important to your decision to purchase FLiK tokens

that TI was identified as a co-owner of this project?

**A.**   It was sort of important, yes.  It gave me more confidence

because this is a music artist that is a -- that is a co-owner.

And that to me meant that he was actively involved in the business

and would hopefully want to see it succeed.

         MS. SNEED:   Ms. Etienne, if we could cull out the next

page.  What is that?  Page 6?  Yes.  Right there.  Thank you.

**Q.**   Page 6 of Exhibit 6, Mr. Martinez.

         MS. SNEED:   If you could cull out the picture in the bio

there, Ms. Etienne.  Thank you.

**Q.**   Mr. Martinez, do you see the picture of Tony Gallippi there

and it says, Advisory board?

**A.**   Yes.

1  **Q.**  Had you heard of Tony Gallippi before you saw this on the

2  website?

3  **A.**  Yes.

4  **Q.**  What did you know about Tony Gallippi?

5  **A.**  I knew he was a co-founder of BitPay, which at the time was a

6  major crypto payment company that facilitates transactions between

7  cryptocurrencies and the -- and US dollars and other national

8  currencies.

9  **Q.**  And was the fact that Tony Gallippi was listed as on the

10 advisory board important to your decision to buy FLiK tokens?

11 **A.**  Yes.

12 **Q.**  Did you plan to use the FLiK tokens or hold them as an

13 investment?

14 **A.**  Both.

15 **Q.**  Did you view the whitepaper on the FLiK website?

16 **A.**  I did.

17 **Q.**  Now, I believe you testified earlier that you bought your FLiK

18 tokens in October 2017, is that right?

19 **A.**  Yes.

20 **Q.**  The first time?

21 **A.**  Yes.

22 **Q.**  Was that after the FLiK ICO?

23 **A.**  Yes.

24 **Q.**  Or I should ask, had you heard there had been a FLiK ICO?

25 **A.**  Yes.  From reading the whitepaper, yes.

 1            MS. SNEED:  Ms. Etienne, if we could pull up Government

 2    Exhibits 7, which has previously been admitted into evidence.  If

 3    you could scroll to page 3.  I'm sorry, page 11.

 4    Q.  You testified that you remember looking at the whitepaper.

 5    Does Exhibit 7 look about how it looked to you when you reviewed

 6    it around the time you were thinking of buying FLiK tokens?

 7    A.  Yes.  That is a portion of the whitepaper, yes.

 8    Q.  Do you want us to scroll up and down so you can see the whole

 9    thing?

10    A.  Sure.

11    Q.  Sir, does that look like the whitepaper that you recall

12    seeing?

13    A.  Yes.

14            MS. SNEED:  If we could go to page 11 of Exhibit 7.

15    Q.  Do you see that section, Mr. Martinez, that says "Use of

16    Funds"?

17    A.  Yes.

18    Q.  Do you recall reviewing that at the time that you were looking

19    at the whitepaper?

20    A.  Yes.

21    Q.  And it says that basically all of the funds raised in the ICO

22    would go towards the FLiK platform, is that right?

23    A.  Yes.

24    Q.  And was that representation in the whitepaper important to

25    your decision to invest?

1  **A.**   Yes.

2  **Q.**   Let's turn to a few of your specific transactions on three

3  specific dates.

4  **A.**   Okay.

5  **Q.**   Or actually on two specific dates but three transactions.

6      Did you buy FLiK tokens on or about October 10th, 2017?

7  **A.**   Yes.

8  **Q.**   What platform did you use?

9  **A.**   It was a crypto exchange called CoinExchange.

10 **Q.**   On October 10th, 2017, sir, was it CoinExchange that you

11 purchased FLiK tokens on?

12 **A.**   Oh.  I'm sorry.  This is for my other transaction.  This is

13 from EtherDelta.

14 **Q.**   And what date was that, sir?

15 **A.**   This was also on October 10, 2017.

16 **Q.**   And I placed before you a document marked Government

17 Exhibit 43.  Do you recognize that document?

18 **A.**   Yes.

19 **Q.**   What is that?

20 **A.**   This is a trade that I made on the other exchange, EtherDelta.

21 I made a purchase of 10,669 FLiK tokens.

22 **Q.**   And the actual document of Exhibit 43, is that a screenshot

23 of -- what is it?

24 **A.**   That's a screenshot of my trade history related to FLiK tokens

25 on this crypto exchange.

1  **Q.**   And that crypto exchange is EtherDelta?

2  **A.**   Yes.

3  **Q.**   Did you yourself take this screenshot?

4  **A.**   Yes.

5         MS. SNEED:  Your Honor, I would move to admit Government

6  Exhibit 43.

7         MR. LOWTHER:  No objection.

8         THE COURT:  It's admitted.

9         MS. SNEED:  If you could cull out the -- I guess the

10  bottom portion.  Yeah.  Thank you.

11  BY MS. SNEED:

12  **Q.**   And, Mr. Martinez, you testified earlier that you bought

13  10,669 FLiK tokens, correct?

14  **A.**   Yes.

15  **Q.**   On EtherDelta?

16  **A.**   Yes.

17  **Q.**   And what date was that again, sir?

18  **A.**   October 10, 2017.

19  **Q.**   And what form of cryptocurrency did you use to buy the FLiK

20  tokens?

21  **A.**   For this transaction I used Ethereum.

22  **Q.**   And could you point out to the jury where you see that on

23  Exhibit 43.

24  **A.**   How -- can I just --

25  **Q.**   Is it in the middle of the page under the word "Base"?

1  **A.**   The total for 4.8, that's the number of Ethereum that I spent.

2  **Q.**   I see.  And the fact that you used Ethereum, is that reflected

3  under the word, "Base"?

4  **A.**   Yes.

5  **Q.**   Under the column "Base"?

6  **A.**   Yes.

7  **Q.**   And please explain to the jury the steps you took to purchase

8  these FLiK tokens on October 10th, 2017.

9  **A.**   Okay.  For this particular website I had to connect my

10  cryptocurrency wallet, the wallet basically being a place that I

11  hold cryptocurrencies.  I connected the wallet to this website.

12  And then I had to deposit my Ethereum to EtherDelta.  And then

13  from there I -- I used my Ethereum to buy an existing or -- sell

14  order that somebody had placed on the site, I bought -- I bought

15  an order from that site and -- to -- I'm sorry.  I'm trying to

16  explain this.

17  **Q.**   No problem, Mr. Martinez.

18  **A.**   Yeah.  So I -- I basically bought somebody else's existing

19  order of tokens on the site in the amount equal to the Ethereum

20  that I was able to spend.  If that makes enough sense.

21  **Q.**   Thank you, sir.

22      And Ethereum is another form of cryptocurrency, correct?

23  **A.**   Yes.  Correct.

24  **Q.**   And I've placed before you what's been marked as Government

25  Exhibit 45.  Did you buy FLiK tokens on or about November 7th,

1  2017?

2  **A.**   Yes.

3  **Q.**   And what platform did you use?

4  **A.**   This is a CoinExchange.

5  **Q.**   And Exhibit 45, what is that document?

6  **A.**   This is a document that I put together summarizing all of my

7  transactions, purchases and sales of FLiK.  These are crypto

8  denominated transactions.

9  **Q.**   Where did you get this information from that you put on

10  Exhibit 45?

11  **A.**   I gathered it -- I gathered it from my trade history on both

12  CoinExchange and EtherDelta.  And then I -- I placed all of them

13  in an Excel spreadsheet.

14  **Q.**   Did you go on to CoinExchange and look at your account and

15  then transfer that information to Exhibit 45?

16  **A.**   Yes.

17  **Q.**   And the same with I believe you said EtherDelta?

18  **A.**   Yes.

19  **Q.**   And that is what made up Exhibit 45?

20  **A.**   Yes.

21          MS. SNEED:  Your Honor, I would move to admit

22  Exhibit 45.

23          MR. LOWTHER:  No objection, your Honor.

24          THE COURT:  It's admitted.

25  BY MS. SNEED:

1 **Q.** And there were two transactions on November 7th, 2017,

2 reflected on Exhibit 45, correct?

3 **A.** Yes.

4 **Q.** And what is that first transaction?

5 **A.** First transaction --

6 **Q.** On November 7th, 2017.

7 **A.** Yes.  There was a transaction dated at 12:47 p.m.  I bought

8 5,054 FLiK tokens.

9 **Q.** And what cryptocurrency did you use to buy them?

10 **A.** Bitcoin.

11 **Q.** How many Bitcoins did it take to buy the FLiK tokens?

12 **A.** 0.04.

13 **Q.** And what was the second transaction that you made to buy FLiK

14 tokens on November 7th, 2017?

15 **A.** The second transaction, I bought 6,573 FLiK tokens.

16 **Q.** And what cryptocurrency did you use to buy those?

17 **A.** Bitcoin.

18 **Q.** And how many Bitcoin did it take to buy that many FLiK tokens?

19 **A.** 0.056.  I had placed an order to spend .1 Bitcoin total, and

20 it was fulfilled in two transactions.

21          MS. SNEED:  Ms. Etienne, if you could place on the

22 screen Government Exhibit 45.  And to show the jury, if you could

23 cull out the dates November 7th, 2017, those two transactions.

24 **Q.** And that's what we were just discussing, is that right,

25 Mr. Martinez, on Exhibit 45?

**A.**   Yes.

**Q.**   I've placed before you, sir, what's been marked as Government Exhibit 44.  Do you recognize this document?

**A.**   Yes.

**Q.**   And what is this?

**A.**   This is another spreadsheet that I generated.  This is my FLiK transactions in US dollars.

**Q.**   And where did you get the information to put on Exhibit 44?

**A.**   I took -- I took an estimate of what the Bitcoin or Ethereum, whichever I used in each transaction, I took an estimate of what those cryptocurrencies were worth on the day that I made those transactions using sites such as CoinMarketCap.

**Q.**   What is CoinMarketCap?  Is that what you said?

**A.**   Yes.  CoinMarketCap is a site that tracks cryptocurrencies. You can find -- find price history of -- price history and websites for each major cryptocurrency.

**Q.**   And this website lists the US dollar amount of the cryptocurrencies at the time?

**A.**   Yes.  You can configure it to track prices in US dollars or any other national currencies.

**Q.**   And have you used this website to figure out the US dollar amount of cryptocurrency before?

**A.**   Yes.

**Q.**   Many times before?

**A.**   Many times.  Almost daily.

1  **Q.**  And have you found the website CoinMarketCap with the US

2  dollar equivalent of the cryptocurrency to be reliable as far as

3  how much the price is in US dollars of cryptocurrency?

4  **A.**  I feel it's reliable enough, yes.

5          MS. SNEED:  Your Honor, I move to admit Government

6  Exhibit 44.

7          MR. LOWTHER:  No objection.

8          THE COURT:  It's admitted.

9          MS. SNEED:  Ms. Etienne, if you could call up Government

10  Exhibit 44, please.  And if you could highlight -- thank you,

11  ma'am.

12  BY MS. SNEED:

13  **Q.**  Mr. Martinez, is this what we were just discussing, your list

14  of purchase and sales of FLiK tokens?

15  **A.**  Yes.

16  **Q.**  And can you tell from this document how much the US dollar

17  amount was that you bought on EtherDelta on -- of FLiK tokens on

18  October 10th, 2017?

19  **A.**  Yes.  I spent $1,458.49.

20  **Q.**  And that's towards the bottom of the screen in red there?

21  **A.**  Yes.

22          MS. SNEED:  Ms. Etienne, if you can cull out that row,

23  please.

24  **Q.**  Is that the amount, sir, in the red to the right that you just

25  testified, $1,458.49?

**A.**   Yes.

**Q.**   And, sir, from this document, can you also tell how much US dollars you spent on the two transactions on November 7th, 2017, on CoinExchange?

**A.**   Yes.

**Q.**   And what was that dollar amount?

**A.**   I'm sorry.  We're looking at November 7, 2017?

**Q.**   Yes, sir.

**A.**   I would have to do -- do the math.  I can make an estimate.

**Q.**   I believe, sir, you testified earlier that the first transaction on November 7th, 2017, was for approximately 5,005 FLiK tokens?

**A.**   Yeah.  5,054.

**Q.**   Yes.  And so do we have a US dollar amount listed on Exhibit 44 for that transaction?

**A.**   Yes.

**Q.**   How much is that?

**A.**   Okay.  Yeah.  For that transaction, that was $309.22.

**Q.**   And for that second transaction on November 7th, 2017, where you purchased 6,573 FLiK tokens, what was the US dollar equivalent of that?

**A.**   $402.12.

**Q.**   Do you currently hold FLiK tokens today?

**A.**   I still have them, yes.

**Q.**   And how much do you believe they're currently worth?

1  **A.**  I can only estimate.  I highly doubt that they're worth more

2  than pennies.

3         MS. SNEED:  Thank you, sir.  I have no further

4  questions.  Mr. Lowther may have some questions for you.

5                    CROSS-EXAMINATION

6  BY MR. LOWTHER:

7  **Q.**  Good afternoon, Mr. Martinez.

8  **A.**  Good afternoon.

9  **Q.**  My name is Joshua Lowther, and I represent Ryan Felton.

10  **A.**  Okay.

11  **Q.**  You testified that you're a cryptocurrency trader?

12  **A.**  Yes.

13  **Q.**  You've done that for approximately five years?

14  **A.**  Yes.

15  **Q.**  Which cryptocurrencies have you traded?

16  **A.**  I've traded dozens, major cryptocurrencies and mid caps and

17  small cap projects.

18  **Q.**  Over the entire course of five years?

19  **A.**  Yes.

20  **Q.**  Would you agree that's a highly speculative market?

21  **A.**  Yes.

22  **Q.**  You discovered FLiK on a website named 4Chan, correct?

23  **A.**  Yes.

24  **Q.**  So you don't rely on information from 4Chan; that's just a

25  starting point for your research?

1  **A.**   Correct.

2  **Q.**   So it may give you an idea?

3  **A.**   Yes.

4  **Q.**   And once you get an idea, you do your own research or your due

5  diligence?

6  **A.**   Yes.

7  **Q.**   And when you saw FLiK on 4Chan, you researched obviously that

8  concept and Mr. Felton?

9  **A.**   Yes.

10 **Q.**   So you went to the FLiK website?

11 **A.**   Yes.

12 **Q.**   You read what you could about it?

13 **A.**   Yes.

14 **Q.**   You researched Mr. Felton?

15 **A.**   Yes.

16 **Q.**   You realized that he was a TV and film producer here in

17 Atlanta?

18 **A.**   Uh-huh (affirmative).

19 **Q.**   Correct?

20 **A.**   Yes.

21 **Q.**   He owned his own studio?

22 **A.**   Yes.

23 **Q.**   And you saw some of the works that he produced, correct?

24 **A.**   Yes.

25 **Q.**   And that gave you a higher level of confidence about

1  purchasing FLiK tokens?

2  **A.**   Yes.

3  **Q.**   You mentioned that you saw on the site TI, Clifford Harris, is

4  co-owner?

5  **A.**   Yes.

6  **Q.**   And you saw various social media postings from TI about FLiK,

7  did you not?

8  **A.**   I did.

9  **Q.**   Not so much on Twitter but on Instagram?

10 **A.**   I saw more posts on Twitter.  And I saw them as screenshots on

11 Telegram as well.

12 **Q.**   But those were clearly from TI's accounts?

13 **A.**   Yes.

14 **Q.**   And you have no reason to believe that Mr. Felton could post

15 from TI's account, correct?

16 **A.**   Correct.

17 **Q.**   And you also saw that Tony Gallippi was an advisor?

18 **A.**   Yes.

19 **Q.**   And Mr. Gallippi, he's associated with BitPay, correct?

20 **A.**   Correct.

21 **Q.**   Would you tell the jury what BitPay is just very briefly?

22 **A.**   BitPay is a crypto payments company that facilitates

23 transactions between cryptocurrencies and national currencies such

24 as dollars.  Basically it helps you to check out or -- on websites

25 like you could pay with cryptocurrencies and the merchant can

 1  receive dollars or whatever currencies they want or vice versa.

 2  **Q.**  Thank you.

 3     And Mr. Gallippi has brought cryptocurrency payments into

 4  major businesses, correct?

 5  **A.**  Yes.

 6  **Q.**  Are you aware that Mr. Gallippi actually signed an advisor

 7  agreement with FLiK?

 8  **A.**  I read that, but I was unable to independently verify that

 9  myself.

10          MR. LOWTHER:  Thank you, Mr. Martinez.

11          No further questions, your Honor.

12          THE COURT:  Any redirect?

13          MS. SNEED:  No, your Honor.

14          THE COURT:  Sir, you can step down.  Thank you.

15          Ms. Sneed, Mr. Kitchens, do I understand that you'll

16  have your next witness ready in the morning given the hour.

17          MR. KITCHENS:  That's correct, your Honor.  Just to

18  clarify, is this witness excused?

19          MR. LOWTHER:  Yes, your Honor.  No other questions.

20          (Witness excused)

21          THE COURT:  Thank you.  All right.

22          Ladies and gentlemen of the jury, that's going to be our

23  last witness for this afternoon.  I think most mornings we will

24  try to start by 9:00.  Tomorrow morning the Court has another

25  hearing that was unavoidable and had to be done at 9:00 tomorrow

```
 1  morning, but it's going to be a very short one.  So tomorrow
 2  morning we're not going to start until 9:30.  9:30 tomorrow
 3  morning.  If you could try to shoot to be here by 9:15, that would
 4  be helpful just in case anybody's running a few minutes late,
 5  we'll hopefully all be here and ready to go by 9:30.
 6            Ms. Oduka, do you want -- where do you want to have them
 7  assemble at 9:15?
 8            COURTROOM DEPUTY CLERK: Y'all can come back to the jury
 9  room.  There will be a marshal.
10            THE COURT:  Once they leave the courtroom, if you would
11  escort them and show them how to get back there.  Okay?  All
12  right.  Thank you very much.
13            You're reminded of your instructions for this break and
14  all breaks.  Does anybody want me to repeat them?  No takers.
15  Have a good evening.
16            (The jury exited the courtroom)
17            THE COURT:  All right.  Y'all can have your seats.
18  Thank you.
19            Counsel, anything that we need to discuss this evening
20  or anything in advance of the witness -- first witness tomorrow
21  morning?
22            MR. KITCHENS:  One thing briefly, your Honor, on our
23  end, which is we noticed when we were reviewing some of the
24  exhibits that we have in evidence that there are some redactions
25  that still need to be made.  We are going to work on that
```

1  certainly this evening to make sure the redactions are made to

2  remove the personally identifiable information.  So no other

3  changes will be made to those exhibits.  We just intend on

4  replacing the exhibits with the ones with the redacted copies.

5           THE COURT:  Mr. Lowther, anything to say on that?

6           MR. LOWTHER:  No objection, your Honor.

7           THE COURT:  Very well.  And, again, I do have another

8  hearing hopefully right at 9:00.

9           And, Ms. Oduka, that's by Zoom, correct?

10          COURTROOM DEPUTY CLERK: Yes.

11          THE COURT:  So if y'all could also try to be here and

12  ready to go closer to 9:15.  Hopefully we'll definitely be able to

13  start by 9:30 if not even a few minutes earlier.  It will be

14  appreciated.

15          With that, I hope everyone has a great evening.

16          Ms. Oduka, thank you.

17          Ms. Coudriet, thank you.

18          And to our court security officer, I appreciate your

19  help.

20          Everybody take care.

21          (After a recess, proceedings were continued as follows:)

22                              - - - - -

23

24

25

1                        C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT

4    NORTHERN DISTRICT OF GEORGIA

5

6        I do hereby certify that the foregoing pages are a true and

7    correct transcript of the proceedings taken down by me in the case

8    aforesaid.

9        This the 15th Day of May, 2023.

10

11

12

13

14        _____

15              PENNY PRITTY COUDRIET, RMR, CRR
              OFFICIAL COURT REPORTER
16

17

18

19

20

21

22

23

24

25